# THE SHAWNEE FIRE INSURANCE COMPANY OF TOPEKA, KANSAS, *vs.* MORRIS PONTFIELD.

*Fire Insurance—Stipulation as to Appraisement of Loss— Failure of the Appraisers to Agree Upon Umpire—Action on Policy Without Award.*

When a policy of fire insurance provides that no action shall be brought on it until after compliance with a provision requiring the amount of loss to be ascertained by appraisers to be appointed, one each by the respective parties, and by an umpire, selected by them to act in the event of disagreement, if the insured in good faith complies with this provision and is not responsible for the failure of the appraisers to agree as to the amount of the loss or in the selection of an umpire, he may maintain an action on the policy, within a reasonable time after the appointment of the appraisers, although the defendant has not waived the appraisement.

A policy of fire insurance provided that in case of a disagreement between the parties as to the amount of the loss, the same should be ascertained by disinterested appraisers, one each to be appointed by the company and the insured, and the two so chosen to select an umpire to settle the points of difference, the award in writing of any two to determine the amount of loss, and also that no action on the policy for the recovery of any claim should be sustained in any Court until after full compliance by the insured with said requirement. The goods insured under the policy were damaged by fire on

September 3rd, 1907. After notice and proof of loss, an agreement appointing appraisers was made on November 1st. The appraiser of the insured suggested as the umpire the names of a number of persons living in the locality and engaged in the same kind of business, but the appraiser of the company refused to accept any of them, and the appraiser of the insured refused to accept the names of persons suggested to him, on the ground that they did not live in the city or were not familiar with the value of goods of the kind damaged by the fire. Suit on the policy was instituted January 1, 1908. *Held,* that since the appraisers had had a reasonable time in which to make the appraisement and select an umpire, and since the appraisement had failed without the fault of the insured, he is entitled now to sue on the policy, and the arbitration clause therein, is not a bar to the action, although the appraisement was still pending, in the sense that it had not been abandoned or waived by the defendant.

*Decided March 22nd, 1909.*

Appeal from the Court of Common Pleas of Baltimore City (DOBLER, J.)

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS, WORTHINGTON and HENRY, JJ.

*James McEvoy, Jr.,* and *Jos. Townsend England,* for the appellant.

From an analysis of the appellant's prayers, it will be seen that it relied upon the fact that an agreement to appraise the loss suffered by the appellee had been entered into; that the appraisers appointed by each of the parties were endeavoring at the time this suit was instituted to agree upon an umpire, and that as shown by all of the testimony the appraisers had not at this time been able to agree upon an umpire, and that therefore the appraisement was still pending, and under the terms of the policy of insurance issued to the appellee by the

appellant, and under the pleadings in this case no suit could rightfully be maintained, such appraisement neither having been determined nor abandoned by the act of the appellant.

The questions presented in the case of *Conn. Fire Ins. Co.* v. *Cohen,* 97 Md. 294, and which was relied upon by the appellee below, were essentially different from the case at bar. In that case the sole question presented to this Court was, whether or not the appraisers appointed under an appraisal agreement similar to the one in this case were agents of both the assured and insurer, and whether their conduct could bind the respective parties.

Under the replication filed by the appellee to the appellant's plea, it would seem that to entitle the appellee to a recovery he must have shown that the appraisal agreement entered into was abandoned by the defendant prior to this suit having been brought, and also that the appraisers absolutely failed to agree upon an umpire, and that the said appraisement was abandoned.

There is not one word in the testimony showing that the appraisement had either failed or been abandoned by either appraiser, and certainly not by the appellant. On the contrary, there is abundant proof showing that not only at the time the suit was instituted were the appraisers seeking to select an umpire, but that even after the case had been instituted the appraiser for the appellant endeavored to discover from the appellee's appraiser whether Mr. Fogarty would be agreeable to him as an umpire, and urging him by his letter of January 16th to come to some conclusion in the matter as soon as possible.

To entitle the appellee to any recovery not only must it have appeared that the appraisal agreement had failed, and that the appraisers could not come to any agreement as to an umpire, but also that these facts were distinctly known to Mr. Baetjer, the appellee's agent, before the institution of this suit, and that he acted in good faith upon such information and with the full belief that the appraisement had both failed and been abandoned. Where the unreasonable conduct of the

assured's appraiser has been set up as a justification for the
insured treating the appraisement as having been abandoned,
the cases hold that an appraiser for the insurance company
cannot refuse arbitrarily and without any reason to select any-
one from the vicinity of a fire—meaning thereby the town in
which the fire occurred and from the place where a jury would
be drawn if the matter was in suit—but that he is not unrea-
sonable in insisting upon someone being selected who resides
in a different part of the town or city from which the fire oc-
curred. *Niagara Fire Ins. Co.* v. *Bishop,* 154 Ill. 9, 45 Am.
St. Rep. 105; *Brock* v. *Dwelling House Ins. Co.,* 102 Mich.
583, 26 L. R. A. 624; *Hickerson* v. *German Am. Ins. Co.,*
96 Tenn. 193, 32 L. R. A. 172; *Chapman* v. *Rockford Ins.
Co.,* 89 Wis. 572, 28 L. R. A. 405; *Grady* v. *Home F. & M.
Ins. Co.,* 4 L. R. A. (N. S.) 288.

But even if Pattison had been unreasonable in his refusal
to look at the list of names which Waldorf says he submitted
to him, and which Pattison says positively he never did, there
is nothing in the record to show that Waldorf considered the
appraisement as at an end by such action of Pattison or that
he communicated such knowledge to Waldorf; and certainly
all of the testimony conclusively shows that Pattison did not
think the appraisement was at an end, as witness his letter of
January 16; and in fact we do not know when this alleged list
was submitted to him. Waldorf says that he handed the list
to Pattison the middle of December, "or something," he
"thinks it was the last time he was there."

The only question to be determined in this case is not
whether the appraisers failed absolutely to agree upon an um-
pire, but whether by not agreeing upon one before the suit was
instituted was their conduct in not so agreeing sufficient to
justify the appellee in disregarding the provisions of the pol-
icy: At the time the suit was brought nothing had occurred
to warrant either appraiser in imagining that it was hopeless
for him to come to an agreement with the other as to the selec-
tion of an umpire, and surely, because Pattison absented him-
self from the city for a period of three weeks, Baetjer was

not thereby warranted in concluding that the appraisement had utterly failed, particularly when there is the most abundant proof in the record that such absence on the part of Pattison was not done with any idea of embarrassing the adjustment of the appellee's loss, and that he did everything, both before leaving Baltimore and upon his return, to arrive at an agreement with Waldorf as to the person to act as umpire.

*Charles F. Harley* (with whom was *J. B. A. Wheltle* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

Morris Pontfield received from the Shawnee Fire Insurance Company of Topeka, Kansas, on the fourth of December, 1906, a policy of insurance, insuring him against loss or damage by fire on certain merchandise and fixtures in the building No. 712 South Broadway, Baltimore City, to the amount of $1,500.00.

The policy contained the following provisions: "In the event of disagreement as to the amount of loss the same shall, as above provided, be ascertained by two competent and disinterested appraisers, the insured and this company each selecting one, and the two so chosen shall each select a competent and disinterested umpire; the appraisers together shall then estimate and appraise the loss, stating separately sound value and damage, and, failing to agree, shall submit their differences to the umpire; and the award in writing of any two shall determine the amount of such loss; the parties thereto shall pay the appraisers respectively selected by them and shall bear equally the expense of the appraisal and umpire. * * * No suit or action on this policy for the recovery of any claim shall be sustained in any Court of law or equity until after full compliance by the assured with all the foregoing requirements, nor unless commenced within twelve months next after the fire."

On the third of September, 1907, while this policy was in force, the property mentioned therein was consumed or dam-

aged by fire. Proper notice and proofs of loss to the amount of $1,272.95 were duly furnished by the insured. He and the insurance companies interested, including the appellant, being unable to agree as to the amount of the loss, pursuant to the above provisions of the policy, entered into an agreement submitting the matter to appraisers. The insured selected William Waldorf and the insurance companies selected Samuel Pattison, and they were required by the terms of the agreement to appoint a competent and disinterested umpire, to whom they were to submit "matters of difference only."

On the 11th of January, 1908, no umpire having been appointed by the appraisers, and no appraisement having been made, the appellee brought suit on the policy to recover $258.03, the amount of loss for which he claimed the appellant was liable. The appellant, in addition to the general issue plea, set up in a special plea the provisions of the policy referred to and the agreement submitting the matter of the amount of loss to appraisers, and averred that it "did and performed all that was required and could be done by and in behalf of the defendant to procure and perfect such submission, award and determination. * * * and at the time of the commencement of this suit the award was not ready to be delivered and no award had been obtained, but the said arbitration was then pending and undetermined—whereof the said plaintiff had notice," etc.

The appellee joined issue on the first plea, and replied to the second plea—first, that the appraisement was abandoned by the appellant before suit; second, that the failure to appraise was not caused by the fault of the appellee; and, third, that the appraisers failed to select an umpire and the appraisement was abandoned before suit without fault on the part of the appellee.

To these replications the appellant filed the following rejoinders, on which issue was joined by the appellee: 1. "That the said appraisement was not abandoned by the defendant prior to the suit." 2. "That the failure to appraise said loss was caused by the fault of the plaintiff." 3. "That the ap-

praiser appointed by the defendant in this suit never refused
to select an umpire, but, on the contrary, endeavored by all
means in his power to arrive at an agreement with his co-
appraiser to select an umpire mutually agreeable to both, and
that at the time this suit was instituted he was waiting fur-
ther advisement from his co-appraiser who had been appointed
by the plaintiff in this case, and that so far as the defendant
and his appraiser are concerned they had no intimation that
there was any intention to abandon the appraisement, and that
the abandonment of the same was entirely the fault of the
plaintiff."

The only questions presented by the record relate to the
right of the appellee, under the provisions of the policy re-
ferred to, to maintain the suit.   The second exception was to
the refusal of the Court below to grant the following prayers
of the defendant:

1. The defendant prays the Court to instruct the jury that
from the evidence in this case there has not been such a com-
pliance with the terms and conditions of the policy of insur-
ance, which was issued to the plaintiff by the defendant, and
under which the suit against the defendant was instituted, as
to entitle him to any recovery against the defendant under the
pleadings, and their verdict must be for the defendant.

2. The defendant prays the Court to instruct the jury that
there is no evidence in this case showing that the arbitration
and appraisement of the loss by fire suffered by the plaintiff
had at the time of the institution of this suit been either aban-
doned or waived by the defendant; but that, as shown by the
undisputed evidence in this case, the said arbitration was
pending at the time the said suit was so instituted, and had
not been determined or concluded, and that therefore the
plaintiff is not entitled to recover under the pleadings in this
suit, and their verdict must be for the defendant.

3. The defendant prays the Court to instruct the jury that
from the undisputed evidence in this case, the appraisement
of the loss by fire suffered by the plaintiff was submitted by
him and the defendant to arbitration, in accordance with the

terms and provisions of the policy of insurance issued by the defendant to the plaintiff, and that at the time of the institution of this suit the same was pending and had not been abandoned by the defendant, and that, therefore, the plaintiff is estopped from maintaining this suit, and their verdict must be for the defendant.

It is the duty of both parties to a contract of insurance which provides, in case the insured and insurer cannot agree as to the amount of loss, for the submission of the question of loss to arbitration, to act in good faith and to make a fair effort to carry out such provision and accomplish its object, and it has been accordingly held in a number of cases where the failure to secure an award after submission to arbitration is due to the fault of the insured the absence of an award is a bar to an action on the policy, but where it is due to the fault of the insurance company or its appraiser the insured may bring suit on his policy without an award. These cases are collected in an extensive note to *Bernhard* v. *Rochester German Ins. Co.,* 79 Conn. 388, reported in 8 *Am. & Eng. Annotated Cases* on pp. 302-304, and some of them are there cited as going to the extent of holding that where the arbitration fails because of the fault of the appraiser appointed by the insured suit cannot be maintained; but since the cases of *Caledonian Ins. Co.* v. *Traub,* 83 Md. 533; *Conn. Fire Ins. Co.* v. *Cohen,* 97 Md. 294, and *Home Life Ins. Co.* v. *Schiff's Sons,* 103 Md. 648, the established rule in this State is that unless the insured is responsible for the failure of the appraisement he is entitled to recover on his policy.

The reason of the rule is both obvious and sound. The right of the insured to bring the suit is not derived from the agreement to submit to appraisement. His policy is the source of his title, and if he in good faith complies with its terms and is in no way chargeable with the failure of the appraisers to make the appraisement, his right to maintain the action is complete. The primary obligation of the insurer is to pay the loss, and it is the right of the insured to enforce that obligation. The agreement to submit to appraisement only provides

a means of ascertaining the loss. If that means fails without his fault, the rights of the insured under his policy are not by reason thereof forfeited. If such a result is contemplated by the parties to a contract, they should be required to so stipulate in clear and positive terms. All that the law exacts is a compliance with the terms of the contract. It is the duty of the insured to select a competent and disinterested appraiser. If he does so in good faith, the person so selected is in no sense his agent. On the contrary, he is required to abstain from any interference with the appraisement. He cannot be held responsible for the conduct of one whom he is forbidden to influence and with whom he has not interfered in the discharge of his trust. If, on the other hand, no award is obtained by reason of the fault of the appraiser selected by the insurer, the insured has a right to sue, not because the appraiser so in fault is the agent of the insurer, but because the means provided by the contract of ascertaining the loss failed without any fault on the part of the insured. There may, of course, be circumstances under which it would be the duty of the parties to select new appraisers, but, so far as the appellee is concerned, no such question is presented in this case.

There is not a suggestion in the record that the appellee did not act in good faith in the selection of an appraiser, nor is there any evidence to show that either the appellee or his adjuster did anything to prevent an appraisement, unless, as contended by the appellant, it was prevented by the bringing of the suit. If, therefore, there was any evidence in the case tending to show that before the suit was brought the submission to appraisement had failed, the prayers of the defendant were properly refused. These prayers present the proposition, and learned counsel for the appellant contend, that suit cannot be brought, after submission to appraisement, until the appraisement is either abandoned or waived by the defendant. We cannot give our assent to this proposition. As we have said, the right of the appellee to bring the suit was not based upon the agreement to submit the question of loss to apprais-

ers, and if, after he, in good faith, complied with the terms of his policy, the appraisers failed, without any fault on his part, to agree upon an umpire, after having had a fair and reasonable opportunity to do so, he had the right to sue. To hold otherwise would enable the insurer to postpone indefinitely the recovery by the insured of the benefits of his policy.

J. George Baetjer, appellee's adjuster, states that the agreement appointing appraisers was executed about the first of November, 1907; that about the middle or latter part of December he learned from Waldorf, the appraiser selected by the insured, that Pattison, the appraiser selected by the appellant, had left the city in bad health and had gone to Florida, and that they had not agreed upon an umpire, and that he then went to see Mr. Bond, appellant's adjuster, and told him what he had learned and that he didn't know when Pattison would return, and asked him to appoint some one in his place and that he refused to do it, and on the 11th of January he brought suit on the policy; that sometime after suit was brought Waldorf handed him a letter from Pattison, dated the 16th of January, in regard to the appointment of an umpire, and that he took the letter to Mr. Bond and told him that suit had been entered but that he was willing to go on with the appraisal again provided he would agree that it should not, in case the appraisers did not agree on an umpire, interfere with the suit, but that Mr. Bond refused to make such an agreement. Waldorf testified that after he was selected as appraiser he went to see Pattison "a dozen times or more" for the purpose of appointing an umpire; that he wanted some one familiar with the "line of business" in which the appellee had been engaged and the value of goods of the same character and quality as those destroyed or damaged by the fire; that he presented to Pattison a list of ten names of persons in the same line of business in different sections of Baltimore City, and also suggested other persons, but he refused to consider any of them; that Pattison suggested a gentleman from Richmond, Virginia, one from West Virginia and another from Baltimore County, and that he declined to

appoint either of them because he thought they ought to select some one from Baltimore City who was familiar with the business; that Pattison also suggested Mr. Katten and that he, knowing that Mr. Katten had been in the same kind of business as the appellee, at first agreed to accept him but later learned that he was then working for an insurance company and refused to appoint him; that Pattison suggested Daniel Boss and he refused to appoint him because he was salesman for Likes, Berwanger & Co., engaged in selling "high-priced stock," and did not know anything about the values of low-priced goods such as were sold by the appellee; that he got tired of going to see Mr. Pattison; that Pattison wrote him, and he went to see him again, when he suggested another party, and he told Pattison he did not know him but would find out who he was and let him know in a day or so; that he shortly after learned that Pattison had left the city, and was told by his son or clerk that he had gone to Florida and would not return until sometime in January; that he did his best "to get the thing attended to," but they could not select an umpire; that he tried to agree upon an umpire, but that Pattison would not listen to him "or to anybody" that he mentioned. Joseph Rosenfield testified that he was present when Waldorf handed Pattison a list of names from which to select an umpire, and heard Pattison say: "I wont take any of those."

Pattison testified that after the appraisers were appointed he wrote to Waldorf to come to see him, and when he came he told him that they would first have to appoint an umpire; that Waldorf suggested some one connected with the firm of Grotjan, Lobe & Co., whose name he could not recall, and that he asked him if he was not a creditor and he said yes, and that he then said that a creditor could not serve as an umpire, and that he would think of some names and would notify him in a day or two to come up and talk the matter over; that the first name he suggested to Waldorf was Daniel Boss, connected with Likes, Berwanger & Co., but Waldorf said he would not suit because it was "a too high-toned con-

ccrn, too high-priced;" that he next suggested Wm. S. Ashby, of Straus Bros., but he did not suit; that he then suggested names of Mr. Valentine, of Richmond, Mr. Wilson, of West Virginia, and C. R. Varley Myers, of Baltimore County, but Waldorf said he did not like them because they did not live in Baltimore City; that he also suggested Mr. Yewell, who lived on McCulloh street, but he was not acceptable; that on December 20th, he wrote to Waldorf suggesting Mr. P. T. Fogarty, who was connected with the Maryland Rubber Co., and stating that Waldorf had not, up to that time, given him the name of a single person he had selected to act as umpire; that Waldorf came to see him on the 21st or 22nd and said he did not like the people that he, Pattison, had mentioned, and that he wanted to take some one on Broadway in the neighborhood of the fire; that he, Pattison, objected to taking anyone in that neighborhood because he thought the umpire should be from another part of the city, but that Waldorf did not agree with him, and that witness then told him he would not take anybody from that locality; that he then told Waldorf that he had been working pretty hard and he was going to take a trip to Florida, and would like him to act on Fogarty before he went away, if not he would have to wait until he returned; that he returned on the 15th of January, and on the 16th of January wrote to Waldorf asking him to let him know if Fogarty was satisfactory, and stating that if he was not he would suggest another name, as it was important that the matter should be closed up; that Waldorf did not offer him any names whatever, except the names of some people in that section of Baltimore City where the fire occurred whom he refused to appoint, and the name of some one connected with Grotjan, Lobe & Co.

In *Cohen's Case* the fire occurred August 26, 1901, and the appraisers were selected October 29th, 1901. Applefield, the appraiser selected by the insured, suggested two persons and Likes, the appraiser selected by the insurance company, suggested one person for umpire. Applefield rejected the one suggested by Likes because he did not know him, and Likes

rejected those suggested by Applefield because he had reason to believe that they had sold some of the insured goods to Applefield. Likes testified that he offered to submit to Applefield a list of six names of representative business men of Baltimore from which he could select an umpire but that Applefield declined to accept the proposition. Applefield testified that when he refused to accept the person suggested by Likes, Likes said: "If you are not satisfied with him I will get out of it." This Likes denied, but admitted that he had told company's adjuster that he would 'prefer to step out and let them get another appraiser. He did not, however, resign, and no umpire having been appointed, suit was brought on the 24th of December, 1901. This Court treated the case as one in which the appraisement had failed, and said: "We regard the propositions asserted in the opinion in 83 Md., in *Traub's Case,* as conclusive of the present appeal in so far as to require us to hold that unless the jury were satisfied from the evidence in the case that the failure or abandonment of the appraisement was caused by the fault of the appellee, it constituted no impediment to his right to recover. The rejected prayers failed to submit that question to the jury and were for that reason properly refused." In the case of *Brock* v. *Dwelling House Ins. Co.,* 102 Mich. 583, 26 L. R. A. 623, the loss occured July 25th, 1892, and appraisers were appointed January 27th, 1893. The insured's appraiser wanted to select an umpire from persons living in the locality of the fire, and the company's appraiser insisted upon the selection of some one living elsewhere. Not having reached an agreement upon an umpire, suit was commenced February 18, 1893. At the trial defendant's counsel asked the Court to instruct the jury "that inasmuch as arbitration proceedings had been agreed upon, and were pending, and the arbitrators were, on the day that suit was brought, negotiating with reference to the selection of an umpire, the action was prematurely brought, and plaintiff could not recover," but the Court refused to give the instruction, and, after stating the effect of an agreement to arbitrate, instructed the jury

as follows: "You have heard the negotiations between the two arbitrators, and that they did not agree, unless an arbitration has gone further than merely the appointment of two men and their efforts to agree upon a third party, after the lapse of time that elapsed after this fire and before the commencement of this suit, I charge you, that the clause for arbitration is not a bar to this action." On appeal the judgment was affirmed, and the Court said that persons living in the locality of the fire "would naturally be best qualified to pass upon the question of values;" that no valid reason was assigned by defendant's appraiser for a refusal to accept one of the persons suggested by plaintiff's appraiser, "and the only reason given is that he did not care to take the chances of getting one that would be partial," and that "it is well settled that where the conduct of the company's appraiser in refusing to agree on an umpire is inexcusable and virtually amounts to a refusal to proceed with the appraisement, the fact that the appraisement was not concluded before suit brought will not bar an action on the policy." In the case of *Uhrig* v. *Williamsburg City F. Ins. Co.,* 101 N. Y. 362, the Court held that a claimant cannot be tied up forever without his fault, and against his will, by an ineffectual arbitration, and the cases of *Chapman* v. *Rockford Ins. Co.,* 89 Wis. 572; *L. D. Hickerson & Co.* v. *German Am. Ins. Co.,* 96 Tenn. 193 and *Niagara Fire Ins. Co.* v. *Bishop,* 154 Ill. 9, referred to by the appellant, are to the same effect.

In this case suit was not brought until more than four months after the fire, and more than two months after the selection of appraisers to determine the loss. According to the testimony of appellee's witnesses Waldorf tried to make the appraisement but "could not select an umpire" because of Pattison's refusal to consider any of the persons suggested by him, and failure to suggest anyone living in Baltimore City who was familiar with the value of goods of the kind damaged or destroyed by the fire. There was, therefore, evidence in the case tending to show that after having had a reasonable time in which to make the appraisement, the appraisers

failed to agree upon an umpire, and the appraisement failed because of the unreasonable conduct of appellant's appraiser. Under such circumstances, all, or practically all, of the authorities agree that the Court cannot say that the insured is not entitled to sue on his policy. But apart from any consideration of the conduct of appellant's appraiser, the rule in this State is that when the insured acts in good faith, and does not interfere with the appraisement, he is not responsible for the conduct of the appraisers. If, after having had a fair opportunity, and a reasonable time in which to make the appraisement, the appraisers fail to agree upon an umpire and the appraisement fails, without any fault of the insured, he is entitled to receive the benefits of his contract, and the fact that the appraisement is still pending, in the sense that it has not been abandoned or waived by the defendant, constitutes no bar to his action.

It follows from what we have said, that there was no error in the refusal of the Court below, on the pleadings and evidence in this case, to instruct the jury that the plaintiff had not complied with the terms of his policy, or that the appraisement had not been abandoned or waived by the defendant, and that their verdict should be for the defendant.

The only other exception in the case is to the granting of plaintiff's prayer. This exception was not pressed in this Court, and we assume that the prayer was excepted to on the theory that the case should have been taken from the jury by the granting of defendant's prayers. If not strictly accurate, there was, at least, no reversible error in granting it.

Plaintiff's and defendant's prayers having all been submitted at the same time should have been embodied in one exception. *McCosker* v. *Banks,* 84 Md. 292.

Finding no reversible error in the rulings excepted to, the judgment appealed from will be affirmed.

*Judgment affirmed with costs.*