## ST. PAUL FIRE & MARINE INS. CO. v. ELDRACHER et al.*

Circuit Court of Appeals, Eighth Circuit. July 3, 1929.

No. 8367.

*Rehearing denied September 23, 1929.

William R. Gilbert and Henry Davis, both of St. Louis, Mo. (Bryan, Williams & Cave, and Anderson, Gilbert & Wolfort, all of St. Louis, Mo., on the brief), for appellant.

P. H. Cullen and Raymond S. Davis, both of St. Louis, Mo. (Abbott, Fauntleroy, Cullen & Edwards, of St. Louis, Mo., on the brief), for appellees.

Before LEWIS, Circuit Judge, and WOODROUGH and McDERMOTT, District Judges.

LEWIS, Circuit Judge. This action was brought August 27, 1926, by Rudolph and Anna Maria Eldracher-to recover the full amounts named in three fire insurance policies, $20,000. The policies were issued by defendant, appellant here, to Drozda Real Estate Co., a Missouri corporation, on property which that company owned in the City of St. Louis, to wit:

"The two and three story composition roof brick building, including foundations, plumbing, electrical wiring and stationary heating, lighting and ventilating apparatus and fixtures therein; also all permanent fixtures, stationary scales and elevators, belonging to and constituting a part of said building; occupied as hotel, mercantile and dwelling building situated 4101–09 Manchester Ave., and 4100–12 Chouteau Ave., City of St. Louis, Missouri."

The policies bound the insurer to indemnify the insured, to the extent of the actual cash value of the property, against all direct loss and damage by fire. Each policy contained a coinsurance clause "that the assured shall at all times maintain insurance on each item of property insured by this policy to the extent of at least one hundred per cent. (100%) of the actual cash value thereof, and that failing to do so, the assured shall be a coinsurer to the extent of such deficit, and in that event shall bear his, her, or their proportion of the loss." Each policy also contained a clause to the effect that if the insured and insurer should fail to agree as to the amount of loss or damage, each should appoint an ap-

praiser, they should select an umpire, and the appraisers should then appraise the loss and damage, stating separately sound value and loss or damage, and failing to agree, submit their differences only to the umpire; and that an award in writing so itemized of any two should determine the amount of sound value and loss or damage. On March 1, 1926, the Drozda Company conveyed the property insured to the Eldrachers and the policies were assigned to them with the insurer's consent. A fire occurred nine days thereafter which appellees claim caused a total loss.

The complaint contains three counts, one on each policy, and each count alleges that on March 9, 1926, the insured property was damaged or destroyed by fire, that the amount of direct loss and damage by said fire to said building and articles described in said policy amounted in the aggregate to $70,000; that the actual cash value of said building and articles covered by said insurance policy amounted at the time of said loss to $70,000; that plaintiffs were permitted to carry, under the terms of said policy, and did carry other fire insurance upon said property in the aggregate of $70,000, as the face value of such total insurance; that said policy of insurance provided, among other things, that defendant should not be liable under said policy for a greater proportion of any loss on the property described therein than the amount thereby insured should bear to the whole insurance covering such property. Defendant admitted in its answer that the property was damaged by fire on March 9, 1926, but denied that the building was destroyed; admitted that the amount of damage by fire was $70,000 but denied that the actual cash value of the property covered was $70,000 and stated that its actual cash value at the time of loss was at least $100,000. Under the Missouri valued policy statute defendant could not deny the property was worth as much as the total insurance on it. The answer further pleaded compliance with the Missouri statute in issuing the policies with coinsurance clauses and that on account thereof the insured was given a reduced premium charge, as the statutes required, and that insured voluntarily chose the policies with the coinsurance clause on account of the reduced rate and obtained the benefit of said rate. It alleged that after the fire the plaintiffs applied to the proper city authorities in compliance with the city ordinances for a permit to reconstruct said building, with alterations, and to use the foundation, standing brick walls, and a large part of the iron and steel that was in the building at the time of the fire; that they ob-

tained the permit and used the foundation, walls, and other materials which was in good and safe condition and proper to be used in said alteration and reconstruction, and that their value exceeded the sum of $30,000. Thereon it is alleged plaintiffs are estoppel to claim the parts used were not in good and sound condition for use in reconstruction. The answer also set up the appointment of two appraisers, one by each of the parties, on March 13, 1926, that this insurer, and all other insurers of the property, made written demand for appraisers and therein notified the insured that they had selected Bertram Amber as their appraiser and requested insured to appoint their appraiser, and the latter selected C. B. McCormack. These two selected and in writing appointed an umpire. According to these writings the appraisers were to state separately sound value and damage. Later and on June 15, 1926, the two appraisers made their award in writing as follows:

"Award

"To the parties in interest:

"We have carefully examined the premises and remains of the property involved, in accordance with our appointment, and have determined the sound value and loss and damage to be as follows:

"Sound value $100,000  Loss and damage $74,127.43

"Witness our hands this 15th day of June, 1926.    Bertram Amber,
"Chas. B. McCormack,
"Appraisers."

And this award so made is pleaded in bar. Plaintiffs replied to the plea, challenging the validity of the award. The reply alleged favoritism of both appraisers to the insurer, appointments of both appraisers in many other cases by insurers for the rendition of like services, misrepresentations to insured by McCormack for the purpose of obtaining his appointment, misconduct on the part of the appraisers in making the appraisement, a serious mistake of fact on which the award was in part based, and that the award did not express the judgment of the appraisers, but was made solely for the purpose and in the belief that it would be acceptable to both parties as a basis for settlement. This equitable issue was heard and determined by the court without a jury, and on the facts adduced the court vacated and set aside the award. The conclusion of the court, amply sustained by the testimony, was that the appraisers were not able to agree on either item in their report and arbitrarily

fixed those sums as the basis on which the loss could be settled, in the belief that both parties would be satisfied. Over defendant's objection and exception the court permitted plaintiffs to use McCormack as a witness to sustain their allegations that the award was void. This ruling is assigned as error, and counsel contend that an arbitrator is prohibited from impeaching his award and that on principle the same rule must be applied to appraisers. 5 C. J. p. 243. There is, of course, a marked difference between arbitration and appraisement, in scope of the submission and in the procedure. City of Omaha v. Omaha Water Co., 218 U. S. 180, 30 S. Ct. 615, 54 L. Ed. 991, 48 L. R. A. (N. S.) 1084; Id. (C. C. A.) 162 F. 225, 233, 15 Ann. Cas. 498; Dworkin v. Caledonian Ins. Co., 285 Mo. 342, 226 S. W. 846. The authorization of both is binding as contractual. Here the policy provided for the appointment of appraisers and that the parties would accept and be bound by the award. When an award has been made, in apparent compliance with the terms of the submission, every reasonable presumption in its favor must be indulged, and judicial finding of its invalidity cannot be made without indubitable proof from qualified witnesses that the award "was made without authority, or was the result of fraud or mistake, or of the misfeasance or malfeasance of the appraisers." Barnard v. Ins. Co. (C. C. A.) 101 F. 36, 37; Phœnix Ins. Co. v. Everfresh Food Co. (C. C. A.) 294 F. 51. Arbitrators are said to act both as court and jury, determining the right of a controversy as well as the quantum of relief, while appraisers act ministerially in fixing values. But the rule as to the qualification of an arbitrator as a witness is not as rigid as counsel supposes it to be. An arbitrator or appraiser has no power to act outside the scope of the submission. In the present case the only power delegated to Amber and McCormack as appraisers was to state separately the sound value of the property and the damage thereto caused by the fire. They could do nothing else. They could decide upon nothing except the matters submitted to them. If they went beyond the submission, their award to that extent would be void, and if they wholly failed to pass upon the matters included within the submission their award, whatever it might be, would be wholly void. The true rule on the subject is stated, we think, by Blackburn, J., in Duke of Buccleuch v. Metropolitan Board, L. R., 5 Exch. 221, from which extensive excerpts and comments thereon may be found in Wigmore on Evidence (2d Ed.) § 2358. The learned judge said:

"Now, in cases where an award is good on its face, but the arbitrator has made a mistake either of law or fact, if that mistake has been as to a matter within the arbitrator's authority, then, in as much as there is no court of appeal from the arbitrator, the mistake cannot be remedied; nor can the court, even in the exercise of its equitable jurisdiction, set aside the award, unless it can be shown there was misconduct or some other equitable ground for interference. * * * But if the mistake has been as to the extent and nature of the arbitrator's authority, leading him to exceed it, then, in as much as an excess of authority by mistake is just as much an excess as if it had been in consequence of a wilful disregard of the limits of the authority, the award may be impeached as being made without jurisdiction. Were this otherwise, no one who submits to a reference of one thing could be safe from having an award put upon him as to anything else. * * * Of course, any attempt to annoy an arbitrator by asking questions tending to shew that he had mistaken the law (upon matters within his authority), or found a verdict against the weight of evidence, should be at once checked, for these matters are irrelevant. But where the question is whether he did or did not entertain a question over which he had no jurisdiction, the matter is relevant, and nobody can be better qualified to give testimony on that matter than the umpire."

Mr. Wigmore then commenting upon that case, says:

"The scope of the issue submitted to him defines the limit of his authority to award; hence, the award as made may always be invalidated by the circumstance that it exceeds that scope. In a jury trial, this is ascertainable from the pleadings and the judge's instructions; and the scope of a verdict and a judgment may always be examined in that respect. In an award, the terms of the contract of submission serve in part the corresponding purpose. But, furthermore, since the judge's and jury's functions are united in the arbitrator, and since he does not by distinct instructions to himself define the issues which he submits to himself, the ascertainment of the issues which he has actually investigated and decided may have to be made by inquiring of him whether he considered certain issues, in order to learn whether those issues, as considered, are within the scope of his authority."

In 2 Greenleaf on Evidence (15th Ed.) § 78, we find this:

"And though arbitrators, ordinarily, are not bound to disclose the grounds of their award, yet they may be examined to prove that no evidence was given upon a particular subject; or that certain matters were or were not examined, or acted on by them, or that there is mistake in the award. * * *"
See, also, Wharton on the Law of Evidence, § 599.

We thus come to examine the testimony of appraiser McCormack to ascertain whether he and appraiser Amber acted beyond and outside the scope of the submission in making up their award. McCormack testified that after he and Amber examined the premises they each made their figures and were very far apart, so far apart there was no way of getting them together without a great deal of work, so they agreed to leave it to the umpire, and before the umpire was brought in and asked to serve he had a conversation with the Eldrachers and with other parties who he thought represented the insurance companies, or some of them, and received the impression that both sides would be willing to settle for $55,000; that thereafter he was not concerned about how the amount to be paid the Eldrachers should be arrived at, as long as they might get approximately $55,-000; that he and Amber never agreed on sound value or damage; that after learning, as he believed, that both parties were willing to settle for approximately $55,000 he and Amber met again and they figured out the Eldrachers would receive approximately that amount by making up an award which stated the sound value of the property to be $100,000 and the loss and damage $74,127.43, and their award was so made in the belief on the part of both appraisers that this would be an acceptable basis for settlement, and that they signed it for that purpose. Clearly, this was an abandonment of any further effort to comply with the authority under the submission, and the award which they signed was in the exercise of power not conferred upon them. We think there was no error in admitting McCormack's testimony, which was not contradicted, and in the ruling thereon.

When the case came to trial before the jury these facts were established: The fire started a little before ten o'clock at night. Four alarms were turned in. About twelve high pressure streams were directed through the windows on all sides of the building and were carried against the opposite walls. These were kept going until noon the next day. The flames went through the roof about one o'clock a. m. The floors, except a part of the lower one, and the roof fell into the basement, a burned and tangled mass. Steel roof girders were buckled and twisted by the heat. The walls were saturated and bricks in places on the interior were torn out by the ends of joists and iron or steel beams. The basement was well filled with water. Many of the windows were out, some remained. The outer brick walls were standing and the premises were immediately roped off by the city as dangerous. March 12 the city building commissioner condemned the building as dangerous to life and ordered plaintiffs to secure or remove it. Later permit from the city to alter and reconstruct the building was obtained by plaintiffs. The third floor and a large part of the second had been a rooming house. These rooms were left out in reconstruction. A cross brick wall under the first floor was left out and a brick partition wall and light shaft were omitted. Plaintiffs employed Charles B. McCormack to superintend reconstruction. He seems to have insisted on using parts of the old structure. The outer brick walls and foundation were repaired in places and used, and a large part of the hollow cast iron supporting columns, the steel beams and girders were also used. The three story part of the building, which covered the greater area, was constructed in 1898 at a cost between $32,000 and $33,000. The two story part was built several years later at a cost between $4,500 and $4,600.

William S. Drozda and his son Clifford E., owned the Drozda Real Estate Company. The father had been in the real estate business in St. Louis for 37 years at the time of the trial and he had known the property ever since it was built. They bought it in 1922. Their company was engaged in buying and selling real estate, in building, making loans, writing insurance, collecting rents, and the doing of a general real estate business. When they sold the property to plaintiffs on March 1, 1926, they valued the insured property at $70,000. They estimated the ground at $40,000, the cost of excavating the cellar or basement at $5,000; a total valuation of $115,000. A few months before the fire the insurance on the building was $58,000 and they increased it to $70,000, believing that to be the full value of the building. He gave it as his opinion that that was its full value. He saw the ruins after the fire and would not have used any part of them to repair or rebuild. He did not consider them worth more than the cost of removal of the wreckage. His son had lived in St. Louis all his life and had been in real estate and insurance

business with his father for 17 years. He had known the value of the property since 1916. As an insurance agent he had carried insurance on the building since that time. He testified to the same valuations that his father put on the building, ground and cost of excavation. In the latter part of 1925 they had several offers for the property. Among others a tenant wanted to buy, and that caused them to figure out the value of building, ground and cost of excavating. He said they sold it to the Eldrachers on that basis. Other property adjoining it was included in the sale to the Eldrachers. The total amount for the whole purchase was $165,-000. He testified that when they increased the insurance on the building from $58,000 to $70,000 they believed that to be its full value. That was their purpose, to insure it to its full cash value. Rudolph Eldracher testified that he had bought and sold property in various parts of the city for many years, and when he purchased this property he estimated the building at $70,000. Mr. Doyne, a civil engineer, was an employé of a company that designed and constructed buildings of all kinds and of all classes of material, and had been frequently called in to appraise all sorts of structures, buildings, bridges, and utility plants of all kinds. He examined this property in July, 1926, for the purpose of making an estimate of its value at the time of the fire. He did so by taking into consideration all of the different materials that would be needed to reconstruct it new. This could have been done at a total cost, according to his testimony, of $125,698.50, and then applying his estimate of depreciation he gave its sound value at the time of the fire as $72,-906.13. The defendant offered no evidence as to its cash or market value at the time of the fire, of the kind given by the Drozdas. It called Bertram Amber as a witness, who did not claim to be competent to testify to the cash or market value of the building just before the fire. He was familiar with building construction and he estimated that its reproduction new would cost $143,227.57, and then deducting depreciation he put a sound value on the old building at the time of the fire of $114,582.05. Mr. Klutho, a witness for defendant, was the architect of the insured building, and testified to the amounts above stated as its original cost. He also testified to the great increase in cost of building material and labor as compared to what they were when the building was constructed in 1898. It was his opinion that the three story part of the building, if constructed new at the time of the fire, would have cost between $125,000 and $128,000, and the increased cost of the two story addition would be in the same proportion, but he gave no estimate as to what amount for depreciation should be deducted to ascertain the value of the old building at that time. Other witnesses for defendant took up the different kinds of material in the building and gave their estimates as to their value in the building at the time of the fire, on the basis of cost new less depreciation. Concededly, there is no accepted basis or theory of depreciation. It is a matter of individual judgment to be applied to each particular structure.

The complaint alleged that the actual cash value of the property insured was $70,000 and that plaintiffs' loss and damage was $70,-000. The answer admitted the damage was $70,000. The court instructed that if the insured property was a total loss plaintiffs were entitled to the full amount of the policies. Undoubtedly the far greater weight of the evidence was that the actual cash value of the property was approximately $70,000, and we must assume that the jury so found in rendering a verdict for the amount named in the policies, because the jury were further instructed that "to arrive at the amount that the plaintiffs are entitled to recover from the defendant, you will multiply the amount of the fire damage, $70,000, by the amount of the policy and divide the result by such an amount as you may find the value of the buildings to have been at the time of the fire." If the property was not of a greater value than $70,000, then it was insured for 100 per cent. of its actual cash value and the insured had fully complied with the coinsurance clause. If it was worth more, then by the instruction just quoted defendant was given the benefit of that clause, making plaintiffs coinsurers of the excess. The conclusion that the jury found the actual cash value of the property to be $70,000 seems unavoidable. It follows also from the verdict that there was a total loss. But defendant says that cannot be, because valuable parts of the building were used in reconstruction, fit for that purpose, therefore the loss was only partial. Nevertheless, in the face of the admission that plaintiffs' damage was $70,000 the value of the parts used could not be deducted from that sum. The defense thus, it seems to us, rests wholly on the claim that the actual cash value of the property just before the fire was more than $70,000, and as we have just observed, the greater weight of the evidence on that point was clearly with the plaintiffs. Notwithstanding this dilemma, we will examine the other defenses. The answer set

up an estoppel, in that, the city ordinance gave to the Department of Public Safety, Division of Building and Inspection, full power to decide what material is usable and suitable for use in reconstruction, and here on application of plaintiffs to so decide, that department through its proper official did decide that the brick walls, etc., that were used were safe and suitable for reuse; and secondly, the answer pleads that the materials in the old building that were used in reconstruction were suitable for reuse and valuable for that purpose.

Before considering these defenses, it will be helpful to bear in mind that the policies covered the two and three story building as such, and that fact was not at all affected by "including" some but not all of its component parts in the descriptive part of the insuring clause. The state statute deals with such policies as insurance on real estate, and these policies did not separately insure any integral part of the whole or any separate material composing the structure. They covered the entire two and three story composition roof brick building, without further needed description, and a total loss does not mean that the building or all its parts have been wholly destroyed by the fire. The rule in Missouri has been long settled that the words "total loss," as used in its statute, mean "that the building has lost its identity and specific character as a building, and become so far disintegrated that it cannot be properly designated as a building, although some part of it may remain standing." O'Keefe v. Ins. Co., 140 Mo. 558, 41 S. W. 922, 923, 39 L. R. A. 819; Stevens v. Ins. Co., 120 Mo. App. 88, 96 S. W. 684; Brown v. Ins. Co. (Mo. App.) 184 S. W. 122; Lowry v. Ins. Co., 219 Mo. App. 121, 272 S. W. 79; Stubbins v. Ins. Co. (Mo. App.) 229 S. W. 407; Rogers v. Ins. Co., 157 Mo. App. 671, 139 S. W. 265. This rule is not an exceptional one. Cases applying it in other states will be found in the opinions in the citations supra. To the above quotation from the O'Keefe Case a further principle noted in some of the cases just cited, is stated by Pollock, J., in Liverpool & L. & G. Insurance Co. v. Heckman, 64 Kan. 388, 395, 67 P. 879, 882, thus:

"Although some portion of the building may remain after the fire, yet if such portion cannot be reasonably used to advantage in the reconstruction of the building, or will not, for some purpose, bring more money than sufficient to remove the ruins, such building is, in contemplation of the law, a 'total loss,' or 'wholly destroyed.' "

We come to the claim of estoppel. Three days after the fire the building commissioner for the city served notice on plaintiffs that the three story third class building (covered by the policies) had been inspected by the Division of Building and Inspection and found to be in condition to endanger the lives of persons. Attention was called to some of the effects of the fire, that all walls were water soaked, parts of floors not destroyed were hanging loose, roof completely destroyed, steel roof trusses buckled and twisted, light shaft walls bulged, cracked and settled, I-beams supporting walls sagged, and that the building must be secured or removed by plaintiffs within three days. That if the demand was not complied with the commissioner would remove it under authority of city ordinances and charge the expense therefor as a lien on the property. The next day thereafter R. C. McCormack, who represented plaintiffs, applied in the name of plaintiffs for a permit to remove the débris, shore up and remove all loose hanging sections so as to place it in condition for proper inspection. This permit was granted. Thereafter McCormack, in the name of plaintiffs, applied for and obtained from the Department of Public Safety, Division of Building and Inspection, a permit to remodel and reconstruct the building according to plans and specifications presented therewith, as the ordinance required. The inspector recommended in that connection:

"Take down and rebuild all light shaft walls, also entire brick division wall at west section of three story section. Also entire west court wall of three story section. Also center brick division wall from top of wall down to top of third story window frames. Repair northeast and west parapet walls. Pilasters supporting roof trusses down to a plumb level and solid surface. Take out and replace all defective and missing first, second, third floor and roof joist, and all badly charred and missing mill work. Take out all twisted and overheated structural steel. Replace stairways and make such repairs so as to place bldg. in safe and original condition. Recommend set of plans be submitted. All subject to further inspection as work proceeds."

Thereafter, as the work of repair and reconstruction proceeded under the supervision of McCormack, inspectors made reports as to its progress. Some changes from recommendations of the inspector, noted supra, seem to have been made. Rudolph Eldracher and his son early complained to McCormack about the use of material that was in the

old building for repairs. They were dissatisfied with it as being unfit, but somehow McCormack proceeded with it. The city ordinance relied on provides that no building shall be altered or built upon until examined by the building commissioner or his agents and found to be in safe and good condition. It provides for applications for that purpose, which must state fully the work to be done and the cost thereof. Plans and specifications for the proposed work shall be filed in the Division of Building and Inspection. It prohibits the raising, enlarging and building upon any building or the moving or tearing down of any existing structure in the city until the application therefor is made in writing and the permit obtained, except alterations may be made which do not involve any change in structural parts or of stairways, elevators, fire escapes, or other means of ingress or egress. Obviously, the ordinance is a police measure in the interest of public safety, and this was the sole concern of the city under it. Mr. Hoffman, chief inspector of the building department, so testified, that the sole object and purpose was to see that the building was put in condition so as not to endanger the lives of persons.

In support of this contention counsel for appellant cite Rutherford v. Ins. Co. (C. C. A.) 12 F.(2d) 880, 49 A. L. R. 814; Larkin v. Glens Falls Ins. Co., 80 Minn. 527, 83 N. W. 409, 81 Am. St. Rep. 286; and Lux v. Insurance Co., 221 Mo. App. 999, 295 S. W. 847. In the Rutherford Case the sound value of the building immediately prior to the fire was $21,000. The defendant had insured it for $4,000. The city authorities condemned the ruins and ordered Mrs. Rutherford to remove them. She applied for a permit to repair and restore the building but her application was denied. Her contention was that she sustained a total loss as a result of the fire. The insurance company denied this claim and contended that there was but little damage from the fire but that the fire revealed a defective condition in the building prior to the fire, which caused the order that the remains be torn down and removed. The court accepted the general rule stated in 26 C. J. 351, as follows:

"If by reason of public regulations as to the rebuilding of buildings destroyed by fire, such rebuilding is prohibited, the loss is total, although some portion of the building remains which might otherwise have been available in rebuilding. So, also, if the insured building is so injured by the fire as to be unsafe and is condemned by the municipal authorities, the loss is total."

And then said:

"It needs no argument to show that Mrs. Rutherford sustained a total loss of her property, and a reasonable inference is that she sustained it as a result of the fire. Even though the building was weak and frail beforehand nevertheless if, but for the fire, it would have continued to have value as rentable property, and if it was so damaged by the fire that it [had] ceased to have any value whatever, the fire was the proximate cause of the loss, the producing cause, without which it would not have occurred."

The court rejected the contention that because the policy limited recovery to the repair or replacement of the damaged property, no more could be recovered than what would have been the cost of replacing the burned parts of the building if the city had not prevented repairing it. It was held that the clause of the policy relied upon to support that contention was intended to apply to cases of partial destruction and not to cases of total loss. In the Larkin and Lux Cases, repair of the burned buildings was prevented by city authorities under ordinances and the ruins ordered removed. It was not claimed that either building was totally destroyed by the fire but that plaintiff being prohibited from making repairs suffered a total loss. The court in the Larkin Case quoted from Joyce on Insurance, § 3170, in support of that principle. These buildings were all within city fire limits. Great weight seems to be attached by counsel to the remarks of the court in the Larkin and Lux Cases, to the effect that the ordinance in each was in existence when insurance was obtained, and that both parties to the contract were on that account bound to the provisions of the ordinance. Inasmuch as these ordinances are police regulations we do not see that there can be any difference whether the ordinance be passed before or after the issuance of the policy. Such ordinances are clearly in the interest of public safety and all contractual obligations are subject to the exercise of police power. Manigault v. Springs, 199 U. S. 473, 480, 26 S. Ct. 127, 50 L. Ed. 274; Pennsylvania Hospital v. Philadelphia, 245 U. S. 20, 23, 38 S. Ct. 35, 62 L. Ed. 124; Union Dry Goods Co. v. Georgia P. S. Corp., 248 U. S. 372, 375, 39 S. Ct. 117, 63 L. Ed. 309, 9 A. L. R. 1420; United States v. United Shoe Mach. Co. (D. C.) 264 F. 138, 152. The plaintiffs, in these cases relied on, were prohibited from making repairs even had they wanted to do so. In the present case plaintiffs were given the alternative of removing all of the ruins

or putting them in a safe condition. It was only a question of safety to the public under the ordinance. The facts are evidentiary that the ruins were made safe, but not conclusive as matter of law that parts of the old building were of value for restoration of the building to its former condition or that a reasonably careful owner who understood the situation would have used them for that purpose.

On the second proposition the proof is in direct conflict. Evidence was introduced in behalf of defendant to the .effect that the parts of the old building that were used in reconstruction were sound and fit for that purpose and were used to the advantage of insured. There was evidence for plaintiffs to the contrary by equally competent witnesses, that the walls and other parts used were entirely unfit to be used, that they were without value for building purposes, and were to the disadvantage of the reconstructed building, that as reconstructed it was of far less value than was the old building, because of the use of that material, and that to have thrown down the old walls and remove all the débris would have left no salvage value. That part of the débris that was removed cost the plaintiffs about $10,000 to remove it. If the jury had found that the actual cash value of the property insured was in excess of $70,000, the facts on the issue raised by this defense would have required consideration, but it cannot be said that a finding either way would have been without substantial support; therefore they did not preclude the jury from finding a total loss.

Missouri has a statute which provides for the assessment of a penalty not exceeding ten per cent. of the amount recovered and a reasonable attorney's fee against an insurer where it is guilty of vexatious refusal to pay a loss. Each count of the complaint alleged that defendant's failure and refusal to pay was vexatious, and asked for an attorney's fee and a penalty of ten per cent. on the amount of the policy. The court submitted to the jury the question of vexatious refusal to pay and instructed that if it so found, allowances might be made for the amounts claimed. The jury assessed and included in its verdict both penalties and attorney's fees against defendant, which were carried into the judgment. This is assigned as error. The supreme court of Missouri has held that the phrase "vexatious refusal to pay" means without reasonable or probable cause or excuse; that vexatious refusal is not to be deduced from the mere fact that upon trial the verdict is adverse to the defendant; that defendant is allowed to entertain an honest difference of opinion as to its liability or the extent thereof and to litigate that difference, otherwise the statute would be void; that it is not liable for the penalty and attorney's fee if it acts in good faith in contesting either an issue of fact or an issue of law; that the evidence and circumstances must show that such refusal was willful and without reasonable cause as the facts appeared to a reasonably prudent man before the trial; and that a defendant must be allowed to entertain an honest difference of opinion as to its liability and litigate the matter to establish, if it can, its contention. Block v. Guaranty Co., 316 Mo. 278, 290 S. W. 429; Non-Royalty Shoe Co. v. Phœnix Assur. Co., 277 Mo. 399, 210 S. W. 37; Aufrichtig v. Life Ins. Co., 298 Mo. 1, 249 S. W. 912; Kusnetzky v. Ins. Co., 313 Mo. 143, 281 S. W. 47, 45 A. L. R. 189. And see Commercial Casualty Ins. Co. v. Fruin-Colnon Contracting Co. (C. C. A.) 32 F.(2d) 425. Defendant was willing to pay according to the award made June 15. Under the valued policy statute there is no occasion for an appraisement where the property is a total loss, it applies only to a partial loss; hence, plaintiffs' acquiescence and participation in the award gave defendant cause to believe that the loss was partial only and not total. This was strengthened by the fact that plaintiffs very soon after the fire applied for and received permit to reconstruct and use parts of the old building, and for some time before the award plaintiffs were proceeding with such reconstruction, using therein parts of the old building. Without more it seems to us that defendant was not without reasonable cause or excuse in refusing to pay the full amount of the policies as for a total loss. Moreover, plaintiffs took the position and contend here that the coinsurance statute is void. Defendant relies upon that statute. We think the refusal to pay was not vexatious and the court erred in submitting that question to the jury.

Other errors are assigned. One, strongly pressed, is that the court in its instruction defining a total loss added thereto:

"The foundation walls of a building should not be taken into consideration in determining whether or not there has been a total loss, as the foundation of the building is not within the contemplation of the parties to an insurance contract."

The court had just defined total loss as existing when the building has lost its specific character and is so broken up and disintegrated that it cannot be designated as the

structure which was insured, though some of its parts may remain standing. But it is insisted that the policies themselves in this case specifically mention the foundations as being covered. We have quoted the language describing the property, contained in the insuring clause; and clearly, it was the intention to insure the whole building as a building, including the foundation. And as we have seen, where a building as such is insured, there may be a total loss though some part remains. But conceding that the quoted part of the instruction in reference to the foundation was error—and we think it was—nevertheless, the verdict of the jury on the question of total loss, heretofore discussed, seems to render the point an immaterial one and non-prejudicial to defendant. Nor are we to be understood as approving the instruction given on total loss. If erroneous, it likewise did not prejudice the defendant, for the reasons above stated. The other errors assigned are, we think, of the same character. If they were errors, they were not to the prejudice of the defendant. We are directed by the Act of February 26, 1919 (U. S. Code, tit. 28, § 391 [28 USCA § 391]) to disregard technical errors and defects which do not affect the substantial rights of the parties.

It is our opinion that the judgment on the merits should be approved, but there was error in including therein penalties and attorney's fees. It will therefore be ordered that the judgment be reversed unless within thirty days from the filing of this opinion appellees file in the clerk's office of the United States District Court for the Eastern District of Missouri a remittitur of said penalties and attorney's fees, stating the amounts thereof, and within ten days thereafter file with the clerk of this court a certified copy of the record showing the filing of such remittitur. If such remittitur and certified copy thereof be filed the judgment, less the amounts so remitted, will be affirmed. If such remittitur and certified copy be not filed within the time aforesaid, the judgment will be reversed with directions to grant a new trial.