AMERICAN INS. CO. et al. v. PICKERING LUMBER CORPORATION.

No. 27299–H:

United States District Court
N. D. California, S. D.
Dec. 23, 1949.

were well qualified and competent to undertake this work.

2. That the award made was not only joined in but advocated by the referee appointed by the defendant.

3. That the presumption is that the decision and award of the referees was correct and valid.

4. That the proof of loss filed by the defendant claimed a loss in excess of $742,000 and set forth numerous items, only five of which are involved in this action, none of which five exceeds 7% of the claim involved, and the total of which does not exceed 15% of the total claim.

5. That each of the parties was given a full and fair opportunity to present, and did in fact present, to such referees all the evidence, views, and arguments deemed relevant on all disputed points.

6. That not every disputed item was determined by the referees in favor of the insurers, the plaintiffs herein. While they decided against the assured on several of the disputed items in the proof of loss, which decisions the assured here claims vitiate the award, the referees at the same time decided in favor of the assured on several additional disputed items.

Bearing these considerations in mind, it is necessary to set forth the items which defendant claims were erroneously or inadequately decided by the referees, thereby vitiating the award. These claims are as follows:

Bert W. Levit, Long & Levit, San Francisco, California, for plaintiffs.

Harold Clinton Brown, Harry E. Keough, San Francisco, California, for defendant.

ERSKINE, District Judge.

In determining the issues involved herein several considerations should be borne in mind:

1. That there is no claim that the referees appointed to make the appraisal or arbitration were guilty of any fraud, actual or constructive, misconduct, bias, or partiality; or, that they did not attempt to be fair and equitable and do full justice in the task assigned to them; or that they lacked competence or sufficient qualifications to deal with the complexities involved in such task. It is clear from the record that they

I. That the referees, in determining the profit from the box factory operations, carried on during the loss period for the purpose of reducing the loss to the extent of such profit, as required by paragraph 10 of the policies, costed the lumber used in such operations at OPA ceiling prices, and that this was an error of law and of good accounting practice. (Defendant claims that this alleged error reduced the award to which it is entitled by $73,000, but the evidence tends to show that the difference between the figure claimed by defendant and that reached by the referees was approximately $49,000, after adjustment for expense items not claimed by defendant);

II. That the referees compromised, at the sum of $25,000, defendant's claimed losses (a) for excessive logging cost, (b) for log depreciation, and (c) for increased cost of yard and mill operations, including decking; and

III. That in fixing the "annual value", a necessary element in the computation of recoverable loss under the policy, the referees erred in including depreciation on the destroyed saw mill for the year following its destruction, thereby reducing the award to which the defendant was entitled by the sum of approximately $8,000.

The basis for defendant's contention that these alleged mistakes of the referees invalidated the award is (a) that this was an appraisement and not an arbitration, (b) that as appraisers the referees could not determine questions of law or construe the terms of the policy, and (c) that in the decisions on the disputed issues they erroneously determined questions of law, erroneously construed the terms of the policy, acted outside the scope of the submission, and failed to pass upon matters included in the submission to them.

In discussing these three disputed items I do not believe it necessary to determine whether the reference was an appraisal or an arbitration. The policies under consideration covered the actual loss sustained by the insured by reason of the total or partial suspension of business caused by fire, consisting of the net profits of the business thereby prevented and fixed charges and expenses to the extent they would have been earned had no fire occurred. These policies provided in general that the loss should be reduced by profits earned during a total or partial resumption of business.

These policies were different from the usual fire polices which cover the value of property destroyed by fire. Under the latter type of policy, it is merely the duty of appraisers or arbitrators to determine that value, which is generally purely a question of fact. Under the policies in question, if a reference were required, the referees were of necessity to determine the profits made by the partial resumption of operations and the fixed charges and expenses; if questions of accountancy or of law were implicit in or incidental to such determination it was the clear intent of the provisions for reference in said policies that the referees should make such determinations, whether they were appraisers or arbitrators.

## I.

### Costing Lumber Used in Box Factory Operations at O.P.A. Ceiling Prices.

At the time of the fire defendant owned and operated a large lumber manufacturing plant consisting of a saw mill, planing mill, dry kilns, box factory and similar structures, and owned and operated extensive forests in connection with said plant and for the supply of logs thereto. The operations consisted of felling the trees, bringing the logs to the mill, and putting them through the saw mill, thereby producing different grades of lumber, some of which were sold, some of which were run through the box factory, and some of which were put through other processes. At the time of the fire there were on hand at the mill site milled lumber and logs. There were also felled logs in the forest. After the fire the defendant continued to fell logs, bring them in from the forest, and put them in the mill pond. When the pond was filled, any additional logs were decked. Some of the milled lumber on hand was damaged by the fire. Some of the remainder on hand was apparently processed through the box factory, and some was apparently sold as lumber. The lumber processed through the box factory consisted of 8,828,644 board feet. The source of this lumber was 11,814,000 board feet produced from the latest operations of the saw mill immediately preceding the fire and 3,619,000 board feet taken from the inventory existing on March 31, 1945. In determining the cost of this lumber that was put through the box factory operations, the defendant computed a cost of $39.86 per M, which it describes as average or true cost; in general this was computed by taking all of the lumber from which this 8,828,644 board feet were taken and dividing it by the cost of production including administration and overhead costs allocated to its production, thereby obtaining the average cost, regard-

less of grade, of $39.86 per thousand board feet. The defendant contends that its entire operation was an integrated whole, and since no profit would be realized until the box shook produced by the box factory was sold, which was done, this was the only method of costing the lumber into the box factory to determine the profit realized by its operations.

The insurers contend and the referees agreed that such average cost was an improper method of costing the lumber into the box factory and did not conform to general theory and practice of accountancy. The referees agreed that the lumber should be costed into the box factory at OPA ceiling prices including an adjustment for freight differential favorable to defendant, or else on what is designated as an allocated cost basis which would distribute the common costs of production among the various grades produced, in proportion to the respective market value of each grade at the point of diversion to supplemental processes.

The referees costed the lumber into the box factory at OPA ceiling prices adjusted for said freight differential. It is generally conceded that this was more favorable to the defendant than an allocated cost, if that could be determined. The defendant contends that this was an error of law and thereby rendered the award invalid.

Defendant asserts that the referees thought they must accept OPA ceiling prices. There are some statements to this effect in the depositions, but taking all the evidence into account, it is clear that this thought, if in the minds of any or all of the referees, was not the motivating or actuating basis for their decision. They decided as a matter of practical and realistic accounting that the OPA ceiling price was the fairest, most practical and realistic method of costing the lumber into the box factory for the purpose of determining the profit from the box factory operations.

The reasons for this action by the referees are well stated in plaintiff's exhibit "S", a letter dated March 1, 1948 from Anson Herrick to Paul Barnett, the attorney for the defendant. Herrick was the referee appointed by the defendant. This letter in part reads as follows:

"I believe your contention that the profit of the box factory after the fire should be based upon the average cost of all lumber produced is erroneous, without any foundation in accounting, and can be successful only by the application of some principle or claimed principle of law which will be wholly unrealistic and in disregard of accounting principles. * * *

"It should be obvious that an accurate profit and loss statement would not result if the beginning inventory had nothing but clears and the ending inventory had nothing but commons or vice versa. Because of this the practice of cost allocation is well recognized in accounting. Under this method production cost is allocated between grades in the ratio of their value. This method has a sound basis in the principle that each piece of lumber produced should contribute to the cost of its production in ratio proportionate to its realizable value.

"Lumber, regardless of grade, constitutes a finished product and its reworking into doors or pipe or box shook becomes a supplemental operation and it is fundamental that to determine the profit from such supplemental operation the lumber consumed should be charged in at a price equal to that which could have been realized had the supplemental operation not taken place. This is a general practice among lumber and box manufacturers, the Pickering Lumber Corporation determined a box factory profit upon that basis, and I doubt that you could get any accountant to testify to the effect that that was not the generally accepted basis. It was no surprise to me to be told by the other appraiser that he had consulted three or more accountants connected with lumber operations who informed him that such was the correct basis. * * *

"Another argument which may be made carries out the argument which you have used that in the case of Pickering Lumber Corporation there was what is termed an 'Integrated operation' and that that lumber which was intended to be used for the production of box shook should not be considered a finished product. On such a basis

the problem then becomes one of assigning to the various operations their contribution to the ultimate profit. In other words, while it is true from a legal standpoint that profit is not realized until the sale is consummated, it is unrealistic, viewing the three operations of logging, milling, and box factory as merely parts of one total operation, to contend that all of the profit from the sale of box shook belongs solely to the box factory. In fact, were it not for the fact that lumber is a finished product, the recognition of this principle of the contribution of each department to the total profit is necessary of recognition in many use and occupancy settlements. For the purpose of testing this theory I did make some preliminary computations the result of which developed a loss somewhat larger than that ultimately found, but because that computation was made before a number of other determinations which would bear upon it, it would be necessary for me to completely recompute it if you were to care to use it.

"The danger of the foregoing argument is the fact that profit is not construed to be realized until sale takes place and that consequently the production of each of the departments prior to the final department should be valued at cost which in this case would not be average cost for which you argue, but allocated cost and upon such basis the lumber used by the box factory in post fire operations would be computed as costing at least several dollars less than the O.P.A. prices which were adopted."

In the light of this reasoning it cannot be said that the course adopted by the referees was improper accounting procedure or an error in law.

This conclusion is fortified by the testimony of Rodolph, an expert accountant familiar with general accounting practice in the lumber industry and by the fact that in making a claim against the insurer of the property destroyed by fire, the defendant based its claim for the lumber destroyed on OPA ceiling prices, though the average cost was available. In addition, to determine the profit from the box factory operation for management and income tax pur-

poses, the defendant costed the lumber into the factory at OPA ceiling prices.

The cases of Studley Box & Lumber Co. v. National Insurance Co., 85 N.H. 96, 154 A. 337, 75 A.L.R. 248; Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp., 4 Cir., 64 F.2d 347, and Armour & Co. v. Bowles, Em.App., 148 F.2d 529, relied upon by the defendant in support of its contention that the referees committed an error of law, do not support this contention, because they do not apply to the particular point under discussion. So far as I have been able to discover, neither party has cited any authority upon the exact question, to wit, is average cost, market value, or allocated cost the required or proper basis to use in the circumstances. The case of National Union Fire Ins. Co. v. Anderson-Pritchard Oil Corp., 10 Cir., 141 F.2d 443, cited by the plaintiffs, appears closest in point and supports the conclusion of the referees.

For the foregoing reasons I conclude that the method adopted by the referees in determining the box factory profit did not invalidate the award.

## II.

### Allowance of $25,000.00 to Cover Excess Logging Cost, Log Decking and Log Stain (Depreciation).

At the time of the fire defendant had felled, cut into logs and had on hand in decks 9,550,656 feet of logs. In the nine months following the fire it brought in from the forests to its millsite 11,301,877 feet of logs. Of these logs 5,456,937 feet had been cut before the fire and were lying on the ground, or in banks along side defendant's logging road, and 5,844,910 feet of them had been cut after the fire. This would indicate that at the end of said nine months' period there was in excess of 20,000,000 feet of logs on hand for sawing operation when the sawmill was rebuilt, which was several months after the end of said nine months. For the protection of these logs during the interim defendant claims it was necessary to deck them.

Defendant claims that the excess logging cost of the 11,301,877 feet was $3.60253 per

M foot, or $40,715.40; that the cost of decking, expanding its spur tracks, and other abnormal expenses to retard depreciation of these logs was $12,492.35, and that the stain and like depreciation was $36,149.95; it claims that these items should be deducted from the gross recovery by partial logging operations to determine the net amount of fixed charges and continued expenses recovered by the logging operations. Defendant contends that these items were definitely fixed and ascertainable and were not a matter of estimation or judgment and that each of these items should have been definitely found by the referees. The referees allowed a lump sum of $25,000 to cover these three claimed items and another minor credit item of grazing rentals. Defendant claims that this allowance was a compromise and not a proper discharge of the submission to the referees and that they erroneously passed upon the legal question of whether these items were allowable expenses, thereby exceeding their powers because they had no jurisdiction to determine such a question.

The question of whether there was an "illegal" compromise seems to be a question of fact. There is nothing in the policies or in the reference paragraphs thereof which requires the appraisers to make specific findings respecting the adequacy or inadequacy of each of the many items in the proof of loss. The Supreme Court of California has recently held that the failure to make an express finding in the award on a particular claim does not invalidate the award.

"There is no general rule that arbitrators must find facts and give reasons for their awards. In fact, the rule and general practice is to the contrary." Sapp v. Barenfeld, Cal.Sup.1949, 212 P.2d 233 (reversing Sapp v. Barenfeld, 91 Cal.App.2d —, 204 P.2d 413 cited and relied upon by defendant), and cases cited therein.

The referees were required to decide upon the amount due the defendant under the policies, and the mere fact that they determined that $25,000 was adequate to cover these three items would not be a failure to discharge the submission nor a case of exceeding the submission.

The contention of defendant that these items had been definitely ascertained and were not a subject of estimation or judgment is not supported by the evidence. The figure of $3.6053 per M foot for excess logging cost was given by defendant's witness Momyer at the trial, but Herrick's notes of Momyer's testimony at the hearing before the referees show that Momyer conceded that the question of whether this figure of $3.6053 was excessive was an open one. At the trial Momyer admitted that Herrick's notes in this respect were adequate. The referees found that this excessive logging cost was palpably excessive and Herrick characterized it as a guess and stated "There had been no adequate evidence with respect to this." Also, in Exhibit "V" it is said "a reasonable claim (for excess logging costs) probably would not have been more than $15,000.00 to $20,000.00." The situation was similar with regard to log stain and decking. Defendant's own witness Momyer conceded that the determination of log stain would of necessity be merely an estimate. Referee Maloney states that he was not satisfied with the estimate of $36,149.95 made by defendant's experts for this item, that it was excessive, and that he did not accept it.

Apparently in determining these three items the referees also considered that labor and material costs generally had risen, that labor was more inefficient, and that these factors made the logging cost greater than in similar periods in the past, and would have occurred had there been no fire. Furthermore the appraisers seemed also to take into consideration the factor urged upon them by the insurers (Exhibit 4) that since there was approximately 15,000,000 feet more of logs on hand from these logging operations than normal production there was an accumulation of profit in such logs which was realized after the termination of the loss period.

There were many considerations which entered into the determination of the referees respecting these three items. This determination was reached by them after many lengthy conferences in which all of the considerations affecting the question

were discussed. Herrick says in his letter to Barnett, Exhibit "R": "As I told you this morning it is nearly impossible for me to recite all of the considerations during the very lengthy conferences which led to the determination (of the award) which as you know constituted a unanimous agreement."

Again in another letter to Barnett, Exhibit "S", Herrick says: "As I have explained to you orally, in a situation such as this there is no specific amount which can be asserted to be the correct valuation and that all others are wrong but rather that there is an area within which any amount is appropriate of designation as a fair valuation. The valuation found by the appraisers was in my opinion within that area."

█ After viewing all of the evidence regarding the determination of these three items I cannot conclude that it was inadequate, or that it was a "compromise wearing the dress of an award." I believe it was the result of a long, arduous and conscientious effort to arrive at a fair valuation in which all factors were considered. Thus I cannot find that it falls within the purview of St. Paul Fire & Marine Ins. Co. v. Eldracher, 8 Cir., 33 F.2d 675, or Holker v. Parker, 7 Cranch 436, 3 L.Ed. 396, or the other cases cited by defendant to the same effect as the two just cited. In arriving at this determination the referees may have deferred to the opinions of each other and thus reached a compromise of opinion, but such a concession and compromise is not the "illegal compromise" upon which the above cited Eldracher and Parker cases are based. 6 C.J.S., Arbitration and Award, § 50; Morse, Arbitration of Award 164–165.

As noted above, the case of Sapp v. Barenfeld, 91 Cal.App.2d ——, 204 P.2d 413, relied upon by defendant, has been reversed by the Supreme Court of California. In any case, however, the facts and circumstances of the present case make inapplicable the ruling of the District Court of Appeal in the Sapp case. In that case the arbitrators did not consider or determine one of the issues submitted to them, and they failed to discharge the submission.

It is contended here that the appraisers did not consider or determine these three items, but the evidence is to the contrary. The testimony of Herrick, Maloney and Lilly show that they considered each of these items and that the allowance of $25,-000 included the excess logging cost, the log stain and the log decking. For instance, Maloney testified as follows:

"Q. Then you didn't throw out excessive logging costs? A. No.

"Q. Nor the log stain? A. No.

"Q. Nor the log decking? A. No." (Dep. p. 17)

To the same effect see: Herrick deposition p. 74; Lilly deposition p. 8.

Accordingly it cannot be said that the appraisers failed to consider or determine these three items.

Defendant argues that Herrick considered the log stain deterioration and not depreciation, and therefore refused to consider it. But the testimony of Herrick and the documentary evidence taken as a whole show that Herrick did take the log stain into account and made allowance for it.

Herrick testifies in part as follows:

"Q. All right * * * Now, did you consider that claim? A. That entered into the allowance of $25,000 * * * The excessive logging costs and the stain * * * and the decking."

Herrick did not consider this log stain as depreciation as that term is used in Item II, and therefore did not include it in calculating total insurable values for the purpose of applying the contribution clause, and in this conclusion he was confirmed by the testimony of Momyer. But it is not true that Herrick did not consider this log stain, thinking it not covered by the policies. On the contrary his testimony (including that just quoted), and his letters show that he considered it and made allowance for it in said sum of $25,000.

I cannot find that in this construction of the terms of the policies, or in any construction thereof made by them, Herrick and the other referees misconstrued the terms of the policies. Furthermore, as heretofore stated, the very nature of the questions to be submitted to the ref-

erees by the terms of the policies indicated that it was contemplated by and the intent of the parties that the referees should pass upon any subject that was implicit in or incidental to such determination, including questions of accountancy or law, whether they be called appraisers or arbitrators. Accordingly, if in determining these questions they were required to construe the policies or settle questions of law they were acting within the scope of the submission.

See: Patriotic Order v. Hartford Fire Insurance Co., 305 Pa. 107, 157 A. 259, 78 A.L.R. 899; Continental Ins. Co. v. Titcomb, 8 Cir., 7 F.2d 833; Chandos v. American Insurance Co., 84 Wis. 184, 54 N.W. 390, 19 L.R.A. 321.

For the foregoing reasons I conclude that the allowance of $25,000 for excessive logging cost, decking and log stain did not invalidate the award.

### III.

### Inclusion in Annual Insurable Values of Depreciation on the Burned Sawmill.

By the terms of paragraph 2(A) of the policy, in case of a suspension of operations caused by fire the insurer is liable for the "actual loss sustained by reason of such suspension, consisting of:

"Item I: The net profits on the business which is thereby prevented;

"Item II: Fixed charges and expenses only to the extent to which they would have been earned had no fire occurred, as follows:—* * * *depreciation* * * * and such other fixed charges and expenses which must necessarily continue during a total or partial suspension of business."

Paragraph 4, the "Contribution Clause" reads as follows: " * * * in the event of loss, this Company shall be liable for no greater proportion thereof than the amount hereby insured bears to seventy-five per cent (75%) of the total of the net profits (Item I) and charges and expenses (as specified in Item II) which would normally have been earned during the period of twelve (12) months immediately following the fire."

The combined total of the net profits and the charges and expenses "which would normally have been earned" during the year following the fire, is the so-called "annual value" or "insurable value" which must be computed in order to apply the formula of the Contribution Clause.

The referees included in the "annual value" the sum of $15,000, constituting depreciation on the sawmill, on the theory that such depreciation was a fixed charge which would *normally* have been earned. The defendant, on the other hand, contends that this amount should not have been added to the "annual value" because there could be no depreciation on a destroyed sawmill, and only such fixed charges that *must necessarily continue* during a suspension of business should be included in the said "annual value".

As can readily be shown by carrying out the computation required by the Contribution Clause, the effect of adding $15,000 to the "annual value" is to reduce the amount of the recoverable loss; since the insurers are liable only for that proportion of the actual loss equivalent to the ratio between the amount of the insurance and the "annual" or "insurable" value, any addition to the denominator, which is the "annual value", reduces the proportion, and hence reduces the amount of the recoverable loss.

The disagreement between the parties stems basically from the difference in phraseology between paragraphs 2(a) and 4. Paragraph 2(a) enumerates the items that comprise the actual loss. These items include the net profits and fixed charges which must necessarily continue during the suspension of business. In determining the actual loss, the defendant and the referees correctly excluded the item of depreciation on the destroyed sawmill, since this was not an item that *must necessarily continue* after the fire.

Paragraph 4, on the other hand, is not concerned with determining the actual loss; the purpose of paragraph 4 is to provide the formula for determining the *proportion* of the actual loss for which the defendant-insurers will be liable. The basic item in this formula is the "annual" or "insurable" value, which is defined as "the net profits

(Item I) and charges and expenses (as specified in Item II) which would *normally* have been earned during the year immediately following the fire."

The defendants maintain that the term "expenses which would *normally* have been earned" in paragraph 4 must be limited and restricted by the term *"must necessarily continue"* found in paragraph 2(A), for the reason that the word "expenses" in paragraph 4 is immediately followed by the parenthetical phrase "(as specified in Item II)". I do not believe the defendant is correct in this contention. The parenthetical phrase "(as specified in Item II)" appears to have been inserted in paragraph 4 merely for the purpose of including by reference the list of specific items listed in Item II of paragraph 2(A), so as to avoid the necessity of repeating this rather long list; it was not inserted therein for the purpose of also including by reference the concluding phrase of paragraph 2(A) "which must necessarily continue", so as to greatly restrict the meaning of the concluding phrase of paragraph 4 "which would normally have been earned."

This conclusion is buttressed by the fact that the purpose of the Contribution Clause is to compel the assured to carry full insurance of the values at risk. This purpose could not be achieved if the amount of insurable value would vary depending upon whether all or only a portion of the property actually burns, which would result from an adoption of the defendant's theory.

 Therefore, it is the conclusion of this Court that the referees were correct in including depreciation on the burned sawmill in determining the "insurable value". The cases cited by defendant are not contrary to this conclusion, since they stand only for the proposition that depreciation on destroyed property cannot be claimed by the insured as an item of actual loss; these cases did not concern the determination of "insurable value".

In the light of the foregoing facts and conclusions of law it is the opinion of this Court that the award is valid and binding upon the parties thereto, and that the amount payable by each plaintiff to defendant is the amount heretofore tendered by each plaintiff as alleged in the complaint, and as shown in column (D) of Exhibit "C" attached thereto. Judgment will be prepared and entered in accordance with this opinion.