## HYLAND v. MILLERS NAT. INS. CO.*
### No. 7937.

Circuit Court of Appeals, Ninth Circuit.
Aug. 9, 1937.

*Rehearing denied — F.(2d) —.

736

Morgan V. Spicer, William S. Graham, W. W. Sanderson, and J. W. McCaughey, all of San Francisco, Cal., Robert W. Jennings, of Sacramento, Cal., and W. H. Metson, of San Francisco, Cal., for appellant.

H.ˈA. Thornton, Thornton & Watt, and Thornton & Taylor, all of San Francisco, Cal., for appellees Millers Nat. Ins. Co. and Western Ins. Co. of America.

Redman, Alexander & Bacon, Jewel Alexander, Wm. C. Bacon, and R. P. Wisecarver, all of San Francisco, Cal., for appellees Dubuque Fire & Marine Ins. Co., National Reserve Ins. Co., Minnesota Fire Ins. Co., and Merchants Fire Ins. Co.

Orrick, Palmer & Dahlquist, of San Francisco, Cal., for appellee National Liberty Ins. Co.

Long & Levit, Percy V. Long, Bert W. Levit, and R. P. Wisecarver, all of San Francisco, Cal., for appellee Firemen's Ins. Co. of Newark, N. J.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

DENMAN, Circuit Judge.

Appellant Hyland brought this suit in equity against the Millers National Insurance Company and seven other insurance companies to recover from and apportion between them the amount of loss sustained by him in fire, admitted to be incendiary, in his bag factory, in Sacramento street, San Francisco, on October 19, 1929. Appellant carried fire insurance with the defendant companies totaling $185,000 on his stock of bags and burlap.

All but two of the eight defendants pleaded failure to settle the loss by arbitration, and that such failure was due to the conduct of the plaintiff and the arbitrator appointed by him. This, if true, defeats recovery. Appellant's bill seeks equity for the apportionment of the liabilities of each of the insurers, for, under the terms of all the policies, the liability of each is affected by the liability of the others. His unclean hands as to the six infects his claim of equitable jurisdiction over the others. All the defendants pleaded that in his proofs of loss Hyland was guilty of fraud and false swearing. If true, this, by the terms of the policies, also defeats any recovery.

There are other issues and cross-issues relative to the amount and effect of certain of the insurance policies as between the defendants. If either of the above defenses is sustained, these other issues need not be considered.

At the conclusion of the trial, the District Judge made his findings of fact and conclusions of law in an opinion which he

adopted for that purpose. He found that the proofs of loss were deliberately overstated, with plaintiff's knowledge, in an effort to deceive the insurance companies. He found that this false swearing consisted both of wilful overstatement of out of sight loss, and fraudulent statement of the amount of damage to goods remaining after the fire. He found that the failure to arbitrate the loss was due to the conduct of the plaintiff. He concluded as a matter of law that plaintiff was entitled to take nothing, and dismissed the bill. Appellant Hyland on this appeal claims that the evidence does not support these findings.

The statement of evidence in this case covers over 3,300 pages and takes up 6 large volumes of printed record. The witnesses were heard orally by the District Judge. There was much conflict in their testimony. Some were impeached or attempted to be impeached. It is a case particularly calling for the rule that the findings of the chancellor will be taken as correct unless clearly against the weight of the evidence. National Reserve Ins. Co. v. Scudder (C.C.A.9) 71 F.(2d) 884; U. S. v. McGowan (C.C.A.9) 62 F.(2d) 955, 957; Arkansas Natural Gas Corp. v. Pierson (C.C.A.8) 84 F.(2d) 468, 470; Ditto v. Dufur (C.C.A.8) 88 F.(2d) 266, 269.

A. *The Appellant made no "fair effort" at an arbitration to adjust his claims, but fraudulently frustrated the arbitration provided by the statute.*

The principle of adjustment of claims arising under the insurance policies by arbitration, in which each of the parties chooses an arbitrator or appraiser, and a third, an umpire, is, in turn, chosen by them, was very early established in the great enterprise of fire insurance. Such a beneficent substitute for the complicated and time-consuming processes of common law has been recognized by all the courts. Nowhere has its obvious requirement of integrity on the part of the parties in this quasi judicial process of arbitration been more clearly recognized than in the courts of the State of California, under whose laws the policies before us must be construed.

In the early case of Old Saucelito L. & D. D. Co. v. Commercial Union Assur. Co., 66 Cal. 253, 258, 5 P. 232, 236, the court said: "We think the language of the stipulations [in the policy] brings this case within the principle laid down in the English case above referred to; that it is the clear meaning of the contract that if the amount of loss cannot otherwise be adjusted to the satisfaction of the parties it shall be adjusted by the mode of arbitration therein prescribed; and that until such adjustment, *or a fair effort on the part of the insured to obtain it,* no cause of action arose." (Italics supplied.) The agreement for arbitration in the Saucelito Case provided as follows (66 Cal. 253, 255, 5 P. 232, 233): "10. That in case of difference of opinion as to the amount of loss or damage, such difference shall be submitted to the judgment of two disinterested and competent men, mutually chosen (who, in case of disagreement, shall select a third), whose award shall be conclusive and binding on both parties."

The California Supreme Court holds that without any express provision making the arbitration "or a fair effort on the part of the insured to obtain it" a condition precedent to litigation, nevertheless on a showing of the absence of such a fair effort on the part of the insured, the insured could not recover.

In 1909 the California Legislature adopted the process established in the policies of the insurance companies and required of both the insured and the insurer that arbitration of the *amount* of a fire loss by a tribunal of three arbitrators should be a condition precedent to recovery. Cal.Stat.1909, pp. 404–408; now St.1935, p. 596, Gen.Laws, 1935 Supp., Act 3748, § 2071, p. 932. Each party is to choose a member of this quasi judicial tribunal; they in turn choose an umpire. The character of the two members of the tribunal chosen by the parties is described by the statute in the words providing that the insurer and the insured are each "to appoint a competent and disinterested appraiser * * * and the two so chosen shall before commencing the appraisement select a competent and disinterested umpire."

The two appraisers appointed by the parties "together shall estimate and appraise the loss or part of loss as to which there is disagreement, stating separately the sound value and the damage." If these two fail to agree "they shall submit their differences to the umpire." The tribunal then becomes a three-party tribunal. There shall be an "award in writing." This award becomes effective when "duly verified" by any two of the three. The award "shall determine the amount or amounts of such loss."

Under the decision of the Saucelito Case a recovery cannot be had on the policy un-

less there is "a fair effort on the part of the insured to obtain" such a quasi judicial determination of the amount of the loss.

The California statute next provides for the contingency where there has been such a fair effort on the part of the insured and the arbitration has failed. It recognizes the decision of the Saucelito Case in the following language of the statutory requirement for fire policies (Cal.Stat.1909, p. 408; now St.1935, p. 596, Gen.Laws, 1935 Supp. § 2071, p. 932) : "If for any reason not attributable to the insured, or to the appraiser appointed by him, an appraisement is not had and completed within ninety days after said preliminary proof of loss is received by this company, the insured is not to be prejudiced by the failure to make an appraisement, and may prove the amount of his loss in an action brought without such appraisement."

All but two of the appellee insurance companies here contend that this quasi judicial tribunal was attempted to be created, but that its adjudicating integrity was destroyed ab initio by the insured Hyland, since his member of the tribunal was already corrupted by him and was a corrupt person not only not having the character of disinterestedness essential to a proper participancy in an award in which he with one other would adjudicate the amount, but was a man for years bound to Hyland by a secret course of corrupt conduct, most reprehensible from the standpoint of business ethics, if not criminal in character.

█ The evidence amply sustains the contention of these appellees.

The witnesses showing the character of the arbitrator chosen by Hyland were all heard by the court below and its findings of the dishonesty of both Hyland and his appointee is supported by the usual presumption in equity appeals, where the evidence is heard in open court by the lower tribunal.

█ Not only did appellant Hyland make "no fair effort" to have his loss determined by the body prescribed by the policies and the statute, but he made a most vicious and fraudulent effort to deceive the appellee insurance companies into believing that he had appointed a "competent and disinterested appraiser," whereas in fact he destroyed the possibility of creating the kind of tribunal prescribed by the statute and policies by injecting into that tribunal a corrupt member tied to him by fraud, if not by crime; who had previously assisted him in fabricating evidence of a loss in this same fire; who was

bound to him by secret commissions paid to him in dealings with his appointee's employer; and who was secretly on the payroll of Hyland, for the purpose of defrauding and cheating the appointee's employer. We further find that for these reasons, attributable to the insured, no appraisement was had and that the process of appraisement required by the policies and the statute never could have properly functioned. We agree with the statement of the Tenth Circuit that in such a situation we are entitled to hold against Hyland that "the whole proceeding would be a useless ceremony."

"There can no longer be any doubt as to the validity of the appraisal clause in fire insurance policies. The insured, upon seasonable demand, must comply therewith or there can be no recovery. Hamilton v. Liverpool & L. & G. Ins. Co., 136 U.S. 242, 10 S.Ct. 945, 34 L.Ed. 419; Aetna Ins. Co. v. Murray (C.C.A.10) 66 F.(2d) 289; St. Paul Fire & Marine Ins. Co. v. Eldracher (C.C.A. 8) 33 F.(2d) 675; Phoenix Ins. Co. v. Everfresh Food Co. (C.C.A.8) 294 F. 51. But while the appraisers are appointed by the parties, they are not subject to the control of the parties. Shawnee Fire Ins. Co. v. Pontfield, 110 Md. 353, 72 A. 835, 132 Am. St.Rep. 449; Fritz v. British America Assur. Co., 208 Pa. 268, 57 A. 573. They are not agents in law and ought not to be in practice. If appraisers were subject to the direction of the parties, the whole proceeding would be a useless ceremony, for if the parties cannot agree upon the loss by direct negotiation (and the appraisal clause is operative only in case of disagreement) they could not agree through agents subject to their direction." Norwich Union Fire Ins. Soc., Limited, v. Cohn (C.C.A.) 68 F.(2d) 42, 43, 44, 94 A.L.R. 494.

In arriving at this conclusion, which we would reach if not already established by the law of California in the Saucelito Case, we note that the recognition of the place of arbitrating tribunals in legal civil procedure has been advanced from the area of fire insurance to a general arbitrating law applicable to all business. California Code Civil Procedure, § 1280, et seq., added by St.1927, Cal., p. 404.

The evidence upon which this finding is based is clear and convincing. Hyland appointed as a member of the appraising tribunal one George P. Colbert, who was head of the importing department of the H. M. Newhall Company, a firm of high standing in this community. Colbert was, as the District

Court finds, "ostensibly" a man of high standing in the community.

█ The insurance companies would have no reason to suspect that one in such a position would be a person capable of the frauds committed with Hyland. They were not exposed until Colbert's confession of them in the course of the trial below. The firm of Newhall Company was also engaged in the bag business and there were many transactions between that company and Hyland in which Colbert was the managing agent for the Newhall Company. Colbert's confession, substantiated by other evidence on the books of Hyland, shows that Hyland paid to Colbert secret commissions amounting to as much as ¾ cents per yard on hundreds of thousands of yards of burlap sold to Hyland by the Newhall Company—Colbert acting as Hyland's secret agent in the sale, and that such transactions were approved in the books of Hyland by Hyland himself. The corruption of such commercial bribery has been well stated by the Sixth Circuit: "Any agreement or understanding between one principal and the agent of another, by which such agent is to receive a commission or reward if he will use his influence with his principal to induce a contract, or enter into a contract for his principal, is *pernicious and corrupt,* and cannot be enforced at law." (Italics supplied.) City of Findlay v. Pertz (C.C.A.6) 66 F. 427, 434, 29 L.R.A. 188.

Such conduct is none the less corrupt because it may not have been a criminal bribery: "The whole transaction was tainted with corruption. It was not necessary to show that the money transaction between Doheny and Fall constituted bribery as defined in the Criminal Code or that Fall was financially interested in the transaction or that the United States suffered or was liable to suffer any financial loss or disadvantage as a result of the contracts and leases. It is enough that these companies sought and corruptly obtained Fall's dominating influence in furtherance of the venture." Pan-American Petroleum & Transport Co. v. U. S., 273 U.S. 456, 500, 47 S.Ct. 416, 422, 71 L.Ed. 734.

It further appeared that in the month preceding the fire, Hyland paid to Colbert the sum of $250 and caused the payment to be entered on Hyland's payroll account. Placing it in that account not only was a confirmation of the existence of Colbert's secret employment, but, in the method of Hyland's accounting, less likely to expose this damning fact.

We thus find Hyland's member of the adjudicating tribunal Hyland's mere tool, bound to him in fraud, and now appearing as Hyland's admitted agent in these frauds for which may well have been the compensation he received in the month preceding the fire. Hyland must have demanded the assistance of his tool immediately after the fire, for we find Colbert, out of a clear sky, on the Monday, after Saturday of the fire, discussing it with Alexander Logie, whose high standing is admitted by all the parties. Logie testified he was then requested by Colbert to suppress any information he (Logie) had concerning the price of bags. It seems that Logie was one of San Francisco's leading bag merchants and receiving cable information from the Orient concerning the bag market. It is pointed out that this effort on the part of Colbert was really of little value, because the insurance companies could get this information elsewhere. However, in the light of what happened immediately subsequent to the request to Logie, this attempt at suppression, however slight its value, evidenced the participancy of Colbert immediately after the fire in Hyland's fraudulent schemes against the insurance companies.

The fire occurred in October, 1929. It is fair to presume that the conspiracy began, if not before the fire, immediately afterwards. Sometime in November, 1929, Hyland sent for Colbert, had him procure the blank letterheads and other stationery of the Newhall Company and proceeded to type on it a large number of fictitious contracts, dated several months before the fire, for the purchase of large quantities of bags and bagging material. These fictitious contracts, signed by Hyland and by the Newhall Company, per Colbert, never appeared upon the records of the Newhall Company and were unknown to anyone in that Company except Colbert. The conspirators agreed that they should be cancelled and the cancellations were made.

The purpose of the conspiracy was to deceive the insurance companies insuring against the same fire's interference with the "Use and Occupancy" of Hyland's building, in which his business was conducted. It was to enhance the volume of the business which was the determining factor in adjusting the loss with these Use and Occupancy insurers.

The contracts and the cancellations were in fact presented in the adjustment of the use and occupancy insurance, though it does

not appear and it is immaterial here as to whether the conspirators were successful there in deceiving those companies. What concerns this case is the character of Colbert as a possible member of the arbitrating tribunal as shown from the conspiracy with Hyland, which, whether or not technically a crime, permits a fair inference of an attempt to obtain money under false pretenses.

It is obvious that such a member of the arbitrating group would not consent to any umpire until one was obtained who would be likely to yield to the kind of presentation of facts relative to the value of the property destroyed in the fire which the dishonest Colbert would present. That is to say, it is obvious that Hyland's appointee frustrated the constitution of the tribunal required by the policies and the statute. Colbert proposed various names for the umpire, all of whom had trade relations with Hyland which made them undesirable, and one-half of whom Colbert was compelled to admit in the course of his confession were not such disinterested and competent appraisers as the policies required. It is not surprising that the umpire was not chosen until after the ninety days provided in the policies, before which suit could not be commenced.

The negotiations for an umpire continued and the insurance companies indicated they would accept Mr. Logie, one of the nominees of Colbert. By this time, Colbert concluded Mr. Logie did not satisfy the requirement of the conspirators, for he told Mr. Logie he better not serve. Whereupon Mr. Logie declined. The duplicity of Hyland's tool is apparent from the following from Colbert's letter to Mr. Maris, the companies' nominee, written after Colbert had persuaded Logie not to act as umpire (Tr. 1281): "It gave me great pleasure to have you find out after interviewing Mr. Alexander Logie, one of the gentlemen suggested by me, that he was in no way beholden to Mr. Hyland *and could give a fair and unbiased decision in the case. It is indeed regrettable that Mr. Logie found it necessary to decline to act as he would have been a very capable and just umpire.*" (Italics supplied.)

■ It is argued that the transaction concerning the persuasion of Mr. Logie not to act is not relevant because occurring after the ninety-day period within which suit could not be brought. This objection is not well taken. There is no ninety-day limit on the arbitration. If the arbitrators thereafter reach an award, it is nevertheless binding if suit has not been brought. This duplicity and willingness to frustrate the arbitration, though coming shortly after the ninety-day period, is cumulative evidence of the corrupt character of the man appointed in January by Hyland.

■ Hyland's counsel argue that the provisions for the appointment of arbitrators must be strictly construed in favor of the insured. We are unable to see the pertinence of invoking this principle. It is not to be applied to the facts of a particular case requiring the statutory policy provision to be construed for a favorable verdict to the insured. It is applicable in the case where *every* insured person will be favored by the interpretation. In determining that the group of arbitrators shall be made up of truly disinterested persons, it is as important to the insured as to the insurer that insistence should be had on the integrity and arbitral competence of those participating in the quasi judicial deliberation. It is as important for the insured that the insurer shall not conspire with his arbitrators to cheat the insured, as it is for the insurance company that it should not have palmed off on it as a disinterested arbitrator such a person as Hyland appointed.

The conspiracy to manufacture fictitious contracts, apparently, but not in fact, between Hyland and the Newhall Company, did not stop with the use of those manufactured for the use and occupancy insurance adjustment. *After the trial below had been begun* the conspirators again began their fabrication. It seems that the figures in the contracts created for the use and occupancy adjustment were not high enough and they were refalsified by Colbert and Hyland to indicate higher prices for the type of bags alleged to be destroyed, and which were covered by the insurance of the instant suit. Cancellations, as in the use and occupancy matter, were made so that the contracts did no more than falsely to indicate agreed prices for large volumes of material prior to the fire. That they were not introduced to deceive the court may well be accounted for by the fact that Hyland realized the conspiracy was suspected. This, however, does not detract from the evidential character of the transaction as to the fraudulent intent of the conspirators or the anti-judicial character of Hyland's appointee to the group of arbitrators.

■ It is suggested that this evidence showing frustration of the arbitration proceedings by Hyland and his appointee Colbert

should not be considered by us because the defense to which it is relevant was not properly pleaded by the insurance companies. The answers set up that arbitration "was not had due to the acts of the plaintiff and the appraiser appointed by him." This is obviously sufficient to present the issue as to whether Colbert was disinterested. If he was not disinterested and plaintiff appointed him knowing of his bias and relied on that bias to defeat an honest arbitration, it is clearly shown that arbitration was not had "due to the acts of the plaintiff and the appraiser appointed by him."

**B.** *The Appellant's fraud and false swearing defeats recovery on his claim.*

The incendiary fire occurred in plaintiff's bag factory on the night of October 19, 1929. Subsequently plaintiff prepared and served on defendants his proofs of loss totalling $73,601.96. Of this figure $15,645.25 represented goods obliterated or burned out of sight. In the complaint which began the action below he claimed his loss to be $106,992.83, of which $46,139.46 was alleged to have been burned out of sight.

The trial court found that the out of sight loss was not over $2,000, and that its overstatement in the proofs of loss constituted false swearing on the part of Hyland. If this finding is correct, it will not be necessary to consider the court's further finding as to the fraudulent overstatement of the damage to the goods remaining after the fire.

In examining the evidence upon which the court's finding as to out of sight loss, two aspects should be investigated, separately: (1) Was the out of sight loss, claimed to be over $15,000, materially overstated; (2) if so, was plaintiff guilty of fraud or false swearing when he swore to such proof of loss?

**B. (1)** *The extent of the out of sight loss was materially overstated.*

The court's finding of the out of sight loss is supported by the testimony that burlap in bales is very slow to burn and that the fire arising from the kerosene in the pans placed by this incendiary was what the witnesses from the San Francisco Fire Department call a "flash" fire. That is to say, that it was a fire that flared up quickly and then subsided very rapidly in intensity.

Battalion Chief Mahoney who responded immediately to the alarm testified that the fire at the Hyland plant was easy to extinguish; that it was under control in twenty or thirty minutes; that the fourth floor, where the blaze was comparatively serious, was "overhauled" (to make sure that no fire was still burning) in little more than an hour; that when he arrived he saw fire only on the third and fourth floors; that all the baled stock on the fourth floor was identifiable after the fire, "stood intact."

Marshal Kelly of the fire patrol substantiates the testimony of others that the fire was a "flash" fire, consuming very little material.

Battalion Chief Edward O'Neill was in charge of the fire on the third floor. He testified that the fire on the third floor was out in fifteen minutes from the time he commenced working, which was a few minutes after the fire was discovered. He testified that the fire on the second floor was out in ten minutes and "possibly three-quarters of an hour on the mezzanine and first floor"; that burlap does not burn readily in the sort of fire at the Hyland plant; that there was no evidence of stock being burned out of sight, no considerable quantity of ashes and débris. He tells of seeing the baled burlap burning on the top and sides, but that it was really extinguished before more damage was done to the bales. He says of the fire generally, that it was the fastest stopped fire he had ever experienced in an occupancy of that sort.

Engineer W. D. Gardner visited the premises two days after the fire. He made an extensive survey of the sewing machines, presses and other equipment in the plant. His testimony abundantly justifies a finding that very little if any merchandise could have been burned out of sight. The fire damage to the machines and their wooden stands consisted of a small amount of charring and blistering. Printer's ink, inflammable, was found unburned. Ink rolls, highly susceptible to heat, were intact. The thread in many of the sewing machines showed no more effect than slight discoloration.

The court's conclusion as to the comparatively small amount of damage to the burlap is fortified by the testimony of R. V. Smith, insurance adjuster, who visited the premises and saw the burlap merely "scorched" or burned on the sides and top. He demonstrated in court that burlap does not burn easily.

In addition to hearing witnesses, the trial judge himself visited the premises at Sacramento street and also the plant of the

Pacific Bag Company to which the machinery was removed after the fire. This constitutes sufficient evidence to support the findings.

The finding of intentional overstatement is further supported by the accounting and figures which Hyland offered to support his statement. Some of his stock was in the factory in which the incendiary set the fire and some in a warehouse on Sansome street in San Francisco.

A count was taken right after the fire by one Radford. The Radford inventory shows (not deducting for damage) that there was $86,097.98 worth of goods at the factory after the fire.

In his proofs of loss plaintiff claimed that the inventory at the factory immediately before the fire was $102,453.23. The difference between this figure and that of the Radford inventory is $15,645.25, claimed to be burned out of sight.

The court, on the other hand, found that the goods on hand at the time of the fire amounted to about $88,000. In this view, the out of sight loss would be slightly over $1,-000.

To arrive at his figure of $102,453.23, Hyland employed Hood & Strong, accountants, to build an apparent inventory, taking as a starting point a physical inventory of December 31, 1928. (This despite the fact that another firm of accountants, Ernst & Ernst, had made an inventory as of May 31, 1929.)

Starting with the inventory of December 31, 1928, Hood & Strong added purchases and other expenses from that date to the date of the fire, October 19, 1929. From the total was deducted a figure termed "cost of sales." This last figure was obtained by totalling the sales between December 31 and October 19, and subtracting from that total 4.9 per cent. of it, this being the percentage of gross profits for the year 1928. This percentage amounted to more than $66,000. It is obvious that if the rate of profit in 1929 varied to a substantial extent from the 1928 rate, the apparent inventory of October 19, 1929, would be materially altered. Manifestly an inventory built in this manner is very hypothetical and unreliable.

Subsequently, and for purposes of the complaint filed in this action, Hyland procured Hood & Strong to make another inventory, taking as their starting point the Ernst & Ernst count of May 31, 1929. The

same system was used as in the first inventory. But by this second Hood & Strong report Hyland has an inventory at the factory, before the fire, of $132,947.44. His out of sight loss, consequently, goes up from $15,000 to some $46,000.

The gross discrepancy between the two reports of Hood & Strong is in itself sufficient to justify the trial court in rejecting proof of loss based upon so hypothetical and unreliable a method. In addition, there is considerable evidence that there were material amounts of duplication in the second Hood & Strong report. We need not discuss it here except to remark that it is sufficient, if believed, to warrant the court in refusing to credit the accuracy of these proofs.

Aside from the internal weakness of the Hood & Strong reports, there is a wealth of evidence contradicting them. The general ledger of the Hyland bag company shows goods on hand at the factory before the fire in the amount of $89,383.59, more than $12,000 less than the first Hood & Strong report and more than $40,000 less than the second.

George P. Taylor, Hyland's bookkeeper, kept a count of goods on hand which he called a "summary of stock sheets" and which others term a "perpetual inventory." This was not in evidence, having been lost somehow before the trial, but Taylor testified that it showed goods on hand before the fire amounting to between $88,000 and $89,000. This tallies closely with what the general ledger shows.

The testimony as to the accuracy of the ledger and of Taylor's summary was sharply conflicting. There was ample evidence to warrant the trial court in concluding that both were vastly more accurate than the hypothetical Hood & Strong reports.

The intrinsic weakness of the Hood & Strong inventories, the duplications therein, the evidence from the general ledger, and bookkeeper Taylor's summaries, all tending to show the out of sight loss claim was grossly overstated, corroborates the testimony concerning the physical conditions stated above.

We conclude that the evidence not only justifies the trial court in holding that the out of sight claim was grossly overstated, but makes it difficult to see how any other conclusion could have been reached.

B. (2) *Plaintiff was guilty of fraud or false swearing when he swore to this grossly exaggerated proof of loss.*

Mere overvaluation, of course, does not void a claim on the fraud and false swearing provision of the policy. There must be a deliberate overstatement with intent to deceive. Insurance Cos. v. Weide, 81 U.S.(14 Wall.) 375, 383, 20 L.Ed. 894; Jose Rivera Soler & Co. v. United Firemen's Insurance Co., 299 U.S. 45, 49, 50, 57 S.Ct. 54, 55, 56, 81 L.Ed. 30.

When a claim as manifestly overstated as the one in this case is sworn to by the president of a large bag company, presumably familiar with his own business, the court is justified in drawing some inference that the overstatement was deliberate.

Evidence to the contrary consists of the testimony of Hyland to the effect that he did not personally supervise his factory; he did not know how many goods he had in it; he left his bookkeeping and insurance matters to his bookkeeper; that he was content to take the word of his bookkeeper and of accountants Hood & Strong as to how many goods he had and how much of them was lost or damaged.

On the other hand he testifies that: "I am and have been familiar with the general system of maintaining records that prevailed in our office—in the Hyland Bag Company—during the year 1929." He goes on to identify all the bookkeeping forms and manner of records, most of which were designed by himself. He seems to know when each was in use and when one form superseded another.

If he knows all this, it is reasonable to assume that he knew what the general ledger showed and what Taylor's "perpetual inventory" showed as to the amount of goods in the plant on the night of October 19, 1929.

It is very strange that a man as interested in bookkeeping forms as Hyland declared himself to be, should content himself with a projected "apparent inventory" built up from the basis of December 31, 1928, almost ten months earlier, using an arbitrary figure of rate of profit, without any research or examination on his own part, without the slightest investigation of whether such an apparent inventory checked with his own books, and content to take the accountant's word for everything.

Particularly is this true when we consider that Ernst & Ernst had made an inventory for May 31, 1929. It is a fair inference that Hyland knew of this inventory. Yet in his first proofs of loss he swears to a projected inventory made up by another firm of accountants on the basis of a physical count made five months before the Ernst & Ernst count. It is somewhat fanciful to believe that Hyland, who was the one man vitally interested in the amount of loss, who personally designed most of his own bookkeeping forms, could be so naive in these matters that he would accept and swear to, without question, the first manifestly hypothetical Hood & Strong report, made without any reference to a later inventory which Hyland must have known to exist.

More light on the extent of Hyland's personal knowledge is thrown by the testimony relative to the proofs of loss on goods which were damaged but not alleged to be burned out of sight. Here again Hyland asserts that his bookkeeper, Taylor, and his adjuster, Sugarman, did all the work on the pricing of the inventory of salvaged goods and the proofs of loss in connection therewith.

Yet he admits that he personally handled all the large purchases; that he "made notations from various reports of auditors * * * which figures, I may add, I knew to be correct from my own personal investigation"; "I was familiar with the value on October 19, 1929, and I am today."

R. V. Smith, adjuster for some of the insurance companies, testified to a conversation with Mr. Hyland relative to the pricing of the salvaged goods. He says:

"They filed the proofs of loss about the 24th or 25th of December, as I recall it. It was a short time before that. They were in my office. I asked Mr. Hyland at that time how he fixed the prices on that schedule. He told me that those were from telegrams that he received quoting prices, and they were in code, and he deciphered them properly. I asked him if he did not think it the proper thing to let me have the key to the telegrams and let me make comparisons on those, so I would have something to check on; I explained to him at the time that I had been unable to get price verifications from other burlap brokers or other dealers, they were somewhat reluctant about giving me prices; I told him I would have to make some check on it before I could agree to any value. He told me that those were his private affairs, and that was all the information I could have on the subject. I also asked him at that time if he was satisfied with the grades as well as the prices that he had given me, and he told me that he was, and that I would find that those were 100 percent right.

" * * * I said, 'If you file a proof of loss and you set up incorrect grades or incorrect quantities, or incorrect prices, and swear that those are the correct prices, you will vitiate your policy contract, and by the terms of the contract you might lose all your insurance.' I said, 'I want to warn you of that.' I said, 'I have called Mr. Sugarman's attention to that, and I want you to know that I told him about it.' I addressed that conversation to Mr. Hyland. Mr. Hyland was a little bit peeved at that and said, 'We will take all the chances on that.' "

There was ample evidence to warrant the trial judge in concluding that Hyland was well acquainted with the pricing and grading of the salvaged merchandise on his proofs of loss, and personally participated in making up and presenting such proofs. If this be true, it is very persuasive against the theory that on his out of sight loss he would innocently and without any investigation take the overstated report of an accountant as correct.

Furthermore, Hyland's credibility is seriously weakened by the disclosures relative to the fictitious Newhall contracts (fully discussed, supra). Also by the fact that he told the insurance companies in his proofs of loss that he had no knowledge or belief as to the origin of the fire, when there is ample evidence that he was well aware of its incendiary origin.

It should be concluded, therefore, that the trial judge was well justified in finding that plaintiff was guilty of fraud and false swearing when he swore to his out of sight loss. This makes it unnecessary to consider the involved question of whether there was fraud in the proofs of damage on salvaged merchandise.

Affirmed.

HANEY, Circuit Judge (dissenting.)

I dissent.

The majority opinion in finding appellant guilty of fraud in a suit in equity make the statement that, "It is fair to presume that the conspiracy began, if not before the fire, immediately afterwards." I cannot subscribe thereto. A man is presumed to be innocent at all times until his guilt is established. Likewise fraud is not presumed. The presumption made, I believe to be erroneous.

The majority deny recovery on one ground and then proceed to support that conclusion by reference to and discussion of an alleged second ground. If the first is sound, the second is superfluous. I believe neither is tenable.

I. *The Failure to Appraise the Loss.*

The policies in question contained the following provisions:

"If the insured and this company fail to agree, in whole or in part, as to the amount of loss within ten days after such notification, this company shall forthwith demand in writing an appraisement of the loss or part of loss as to which there is a disagreement and shall name a competent and disinterested appraiser, and the insured within five days after receipt of such demand and name, shall appoint a competent and disinterested appraiser and notify the company thereof in writing, and the two so chosen shall before commencing the appraisement, select a competent and disinterested umpire. * * *

"If for any reason not attributable to the insured, or to the appraiser appointed by him, an appraisement is not had and completed within ninety days after said preliminary proof of loss is received by this company, the insured is not to be prejudiced by the failure to make an appraisement, and may prove the amount of his loss in an action brought without such appraisement."

After this suit was filed, all appellees, except two, pleaded as a separate defense that: "The appraisement was not had due to the acts of the plaintiff and the appraiser appointed by him." There was no defense that the appraiser appointed by appellant was not "a competent and disinterested appraiser," other than might be included in the quoted phrase from the pleading.

The trial court originally held that the failure to appraise the loss was "due to the conduct of plaintiff and his appraiser." (D. C.) 58 F.(2d) 1003, 1012. Appellant thereupon filed a petition for rehearing stating that the court erred in that holding and on several other points. The trial court by supplemental order so worded the same that it is doubtful whether or not it denied recovery on this ground. However, if it did deny recovery, it was on the ground that appellant's appointee was not "disinterested." 58 F.(2d) 1003, 1011.

The majority opinion, as I understand it, holds that the failure to appraise the loss was due to the act of appellant in naming an appraiser who was not "disinterested."

In reaching such conclusion, only the evidence most favorable to appellee appears

to have been reviewed, notwithstanding our duty to consider all the evidence in an equity suit. The opinion infers a conspiracy to defraud, and goes so far as to say: "It is fair to presume that the conspiracy began, if not before the fire, immediately afterwards." I believe such a presumption is erroneous for the universal rule is that fraud is never presumed. To presume a fraudulent conspiracy began at one time is to presume the fraud at that time.

However, if we assume (without so holding) that Colbert was not "disinterested," still I believe it avails appellee nothing, because such defense was not pleaded and therefore was not an issue in the case. The pleading says the things which prevented the appraisement were "acts of the plaintiff *and* the appraiser appointed by him." In the first place, no acts or facts showing prevention of appraisement are pleaded; the statement is a mere conclusion and asserts no defense. In the second place, considering the allegation sufficient, it is quite apparent that the acts referred to are acts done by *both* appellant and the appraiser. It therefore could not possibly mean an act of appellant alone in appointing an "interested" appraiser, because both appellant and the appraiser did not appoint an "appraiser." Appellant alone was required to and did appoint the appraiser.

Such a construction conforms to the intentions of appellees. Had they intended to rely on the fact that the appraiser was "interested," they would have pleaded violation of the first provision quoted, which specifies that the appraiser must be "disinterested." Instead, they plead violation of a provision which is located three paragraphs after the first provision quoted, and the provision alleged to be violated contains not a word requiring the appraiser to be "disinterested." And the violation pleaded, is a "catch-all" averment containing no facts. Having violated the rules of pleading, certainly they should not be encouraged or aided in an attempt to avoid contractual liability for which they were paid the premiums fixed by them.

All the evidence bearing on the question as to whether or not the appraiser was appointed by appellant should be stricken because not responsive to the issues. There is no evidence whatever of any other act which prevented appraisement. I believe recovery cannot be denied on this point.

## II. *False Swearing.*
### (a) *Origin of Fire.*

The policies required appellant in his proofs of loss to state "his knowledge and belief as to the origin of the fire." In the proofs of loss appellant stated: "A fire occurred * * * which originated from cause unknown to this assured." The policies also contained the following provision: "Matters Avoiding Policy. This entire policy shall be void * * * (b) in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss." Appellees asserted as a defense that appellant swore falsely as to his knowledge and belief as to the origin of the fire.

The trial court found that "the evidence clearly shows that this was a 'set' fire and that plaintiff knew it when making his proof of loss," and " * * * Since the evidence of incendiarism was equally well known to both plaintiff and defendants and plaintiff knew that, there was no deception accomplished and perhaps none intended. I do not believe that this defense would alone justify a denial of recovery to plaintiff."

The policy provision quoted requires appellant to specify as to the origin of the fire, two things: (1) Knowledge, and (2) belief. There is no evidence whatever that appellant knew what caused the fire, although there was evidence which would lead one to believe that the fire was a "set" fire as the trial court found. Such evidence cannot be said to be "knowledge" of the origin of the fire. The word "knowledge" as used in the policy evidently meant "actual knowledge" as distinguished from "opinion," because the word "belief" is also used. Appellant could know the origin only if he set the fire, or saw it set.

There is evidence, however, that appellant had a "belief" as to the origin of the fire. As used in the policy "belief" means "opinion." His failure to record his "belief" in the proof of loss does not prevent recovery, because section 2570, Civil Code of California (now St.1935, p. 505, Gen.Laws Cal.Supp. 1935, Act 3748, § 339), provides: "Neither party to a contract of insurance is bound to communicate, even upon inquiry, information of his own judgment upon the matters in question." This defense is insufficient to bar recovery by appellant.

### (b) *Amount of Loss.*

All appellees (except National Liberty Company which asserted false swearing in

regard to the proofs of loss only) asserted· by separate defenses that appellant was guilty of fraud and false swearing: (1) In an instrument "prepared and served" on June 19, 1930, wherein the loss was asserted to be $76,498.62; (2) in the complaint filed alleging the loss to be in the same amount, and in the amended complaint alleging the loss to be $106,992.83; (3) and in the proofs of loss wherein the loss is stated to be $73,601.96.

With respect to the instrument of June 19, 1930, I have found no reference thereto, no argument regarding it, and do not find it mentioned in the opinion of the trial court. Counsel do not point out what this instrument was, and further, it is not alleged that the instrument was made under oath. We should, therefore, treat this defense as abandoned.

With respect to the alleged fraud and false swearing in the complaints, appellant contends that the provision of the policy has no application to statements in pleadings or the testimony at the trial, and relies on Goldberg v. Provident Washington Ins. Co., 144 Ga. 783, 87 S.E. 1077, 1079; Third National Bank v. Yorkshire Ins. Co., 218 Mo.App. 660, 267 S.W. 445, 449; Deitz v. Providence Washington Ins. Co., 33 W.Va. 526, 11 S.E. 50, 58, 25 Am.St.Rep. 908.

I believe this contention is correct. In Insurance Companies v. Weides, 81 U.S. (14 Wall.) 375, 377, 20 L.Ed. 894, the policies required the insured to submit to an examination under oath by any person appointed by the companies; and provided that: "All fraud, or attempt at fraud, or false swearing on the part of the assured, shall cause a forfeiture of all claim under this policy." The court said (14 Wall. 375, at page 382, 20 L. Ed. 894): "It is true the policies stipulated that fraud or false swearing on the part of the assured should work a forfeiture of all claim under them. *The false swearing referred to is such as may be in the submission of preliminary proofs of loss, or in the examination to which the assured agreed to submit.* But it does not inevitably follow from the fact that there was a material discrepancy between the statements made by the plaintiffs under oath in their proofs of loss, and their statements when testifying at the trial that the former were false, so as to justify the court in assuming it, and directing verdicts for the defendants. It may have been the testimony last given that was not true, or the statements made in the proofs of loss may have been honestly made, though subsequently discovered to be mistaken. *It is only fraudulent false swearing in furnishing the preliminary proofs, or in the examinations which the insurers have a right to require, that avoids the policies,* and it was for the jury to determine whether that swearing was false and fraudulent." (Italics ours.) There is no substantial difference between the false swearing provision in that case, and the ones here in question, and therefore the latter, in so far as here material, apply only to the proofs of loss.

Appellees are in error in saying that "the claimant testified falsely *at the trial*" in Claflin v. Commonwealth Ins. Co., 110 U.S. 81, 3 S.Ct. 507, 28 L.Ed. 76, and suggesting that recovery was denied on that ground. Recovery was denied because the claimant swore falsely at an examination had by the insurers in accordance with the provision of the policy, which was similar to the provision in Insurance Companies v. Weides, supra. The former case, in fact, merely follows the rule announced in the latter case. The dictum in Atlas Assurance Co. v. Hurst (C.C.A.8) 11 F.(2d) 250, 251, regarding false swearing by a claimant "in his testimony at the trial," is contrary to Insurance Companies v. Weides, supra, and cannot be followed. The same may be said of Cuetara Hermanos v. Royal Exchange Assurance Co. (C.C.A.1) 23 F.(2d) 270.

Of these defenses, in accordance with the foregoing, those regarding the alleged false swearing and fraud in the proofs of loss, only, can be considered. The question is whether the evidence sustains this defense.

With respect to the overstatement of the loss by a claimant in his proof of loss, such statement, if honestly made, will not prevent recovery.[1] But if the overstatement of the loss is knowingly and willfully made by

---

[1] Insurance Companies v. Weides, 81 U.S.(14 Wall.) 375, 20 L.Ed. 894; Great American Ins. Co. v. Roney & Berger Co. (C.C.A. 3) 42 F.(2d) 816, 818; Orenstein v. Star Ins. Co. (C.C.A. 4) 10 F.(2d) 754, 757; Globe & Rutgers Fire Ins. Co. v. Stallard (C.C.A. 4) 68 F.(2d) 237, 241; Camden Fire Ins. Ass'n v. Penick (C.C.A. 5) 2 F.(2d) 964, 965; Hartford Live Stock Ins. Co. v. McMillen (C.C.A. 6) 9 F.(2d) 961; Spring Garden Ins. Co. v. Amusement Syndicate Co. (C.C.A. 8) 178 F. 519, 531, 102 C.C.A. 29; Atlas Assurance Co. v. Hurst (C.C.A. 8) 11 F.(2d) 250, 251; New York Underwriters' Fire Ins. Co. v. Malham & Co. (C.C.A. 8) 25 F. (2d) 415.

the claimant, he cannot recover :[2] and under such facts, the intention to deceive the insurer is implied, for the law presumes that he intended the natural consequences of his acts.[3]

As heretofore stated, the trial court, by amendment to the original opinion, found "that plaintiff was guilty of wilful and intentional fraud and false swearing in making his proofs of loss."

In examining the evidence, the findings of the chancellor on conflicting evidence are presumptively correct and will not be set aside unless a serious mistake of fact or law appears. National Reserve Ins. Co. v. Scudder (C.C.A.9) 71 F.(2d) 884; United States v. McGowan (C.C.A.9) 62 F.(2d) 955, 957, affirmed 290 U.S. 592, 54 S.Ct. 95, 78 L.Ed. 522; Clements v. Coppin (C.C.A.9) 61 F. (2d) 552, 558; Exchange National Bank v. Meikle (C.C.A.9) 61 F.(2d) 176, 179; Jones v. Jones (C.C.A.9) 35 F.(2d) 943, 945; Easton v. Brant (C.C.A.9) 19 F.(2d) 857, 859; Gila Water Co. v. International Finance Corp. (C.C.A.9) 13 F.(2d) 1, 2.

The majority has pointed out certain evidence in favor of appellees, and without relating any of the evidence in favor of appellant, or making any statement indicating that it considered it, concludes: "This constitutes sufficient evidence to support the findings." It is quite apparent that the majority has treated the case as an action at law, in which our duty is to ascertain whether or not there is any substantial evidence to support the findings. However, this is a suit in equity. As said in Aro Equipment Corporation v. Herring-Wissler Co. (C.C.A. 8) 84 F.(2d) 619, 621: "An appeal in equity brings before the appellate court the whole record, and the court is required to examine the record and try the case de novo. The findings of the trial court, while entitled to great weight, may be adopted or discarded by the appellate court, even though supported by substantial evidence." That is the rule which has formerly prevailed in this court (Presidio Mining Co. v. Overton (C. A.9) 270 F. 388, 389 et seq.; Title Guarantee & Trust Co. v. United States (C.C.A.9) 50 F.(2d) 544, 546), and it has been universally followed in other circuits. A few of the cases are: New York Life Ins. Co. v. Simons (C.C.A.1) 60 F.(2d) 30, 32, certiorari denied 287 U.S. 648, 53 S.Ct. 93, 77 L.Ed. 560; Victor Talking Machine Co. v. George (C.C.A.3) 69 F.(2d) 871, 877, reversed on other grounds 293 U.S. 544, 55 S. Ct. 82, 79 L.Ed. 649; Holmes v. Cummings (C.C.A.5) 71 F.(2d) 364, 365; Laursen v. Lowe (C.C.A.6) 46 F.(2d) 303, 304; Updegraff v. United Fuel Gas Co. (C.C.A.6) 67 F.(2d) 431; Equitable Life Assur. Soc. v. Vaughn (C.C.A.6) 82 F.(2d) 978, 979; Johnson v. Umsted (C.C.A.8) 64 F.(2d) 316, 318; Elliott v. Gordon (C.C.A.10) 70 F.(2d) 9.

In accordance with these cases we are required to weigh the evidence, along with the presumption of correctness attending the chancellor's findings. If, however, the chancellor has made a serious mistake of fact or law, the presumption disappears. Such mistake may be the consideration of evidence wrongfully admitted, an application of erroneous law in finding the fact, or in erroneously weighing the evidence, as shown in New York Life Ins. Co. v. Simons (C.C.A.1), supra, 60 F.(2d) 30, 32. It was there said: "For an appellate court to hold that a finding of fact by a sitting justice in an equity case is clearly wrong, it is not necessary that there shall be no substantial evidence to support it; but, if it clearly appears to the appellate court that the great weight of the evidence is clearly contrary to the factual finding of the sitting justice, or

---

[2] Claflin v. Commonwealth Insurance Co., supra; Cuetara Hermanos v. Royal Exchange Assur. Co., supra, certiorari denied 277 U.S. 590, 48 S.Ct. 437, 72 L.Ed. 1002; United Firemen's Ins. Co. v. Jose Rivera Soler & Co. (C.C.A. 1) 81 F.(2d) 385, reversed on other grounds 299 U.S. 45, 57 S.Ct. 54, 81 L.Ed. 30; Great American Ins. Co. v. Roney & Berger Co. (C.C.A. 3), supra; Orenstein v. Star Ins. Co. (C.C.A. 4) 10 F.(2d) 754, 757; Fidelity-Phenix Fire Ins. Co. v. Benedict Coal Corp. (C.C.A. 4) 64 F. (2d) 347, 352, certiorari denied 289 U.S. 762, 53 S.Ct. 795, 77 L.Ed. 1505; Globe & Rutgers Fire Ins. Co. v. Stallaid, supra; National Fire Ins. Co. v. Renier (C.C.A. 7) 22 F.(2d) 671; Columbian Ins. Co. v. Modern Laundry (C.C.A. 8) 277 F. 355, 20 A.L.R. 1159; Damico v. Firemen's Fund Ins. Co. (C.C.A. 8) 5 F. (2d) 318; Atlas Assur. Co. v. Hurst (C. C.A. 8), supra. Compare American Home Fire Assur. Co. v. Juneau Store Co. (C.C.A. 7) 78 F.(2d) 1001.

[3] Claflin v. Commonwealth Insurance Co., supra, 110 U.S. 81, 95, 3 S.Ct. 507, 28 L.Ed. 76; Globe & Rutgers Fire Ins. Co. v. Stallard (C.C.A. 4), supra; Hartford Live Stock Ins. Co. v. McMillen (C. C.A. 6) 9 F.(2d) 961, 963; Columbian Ins. Co. v. Modern Laundry (C.C.A. 8) 277 F. 355, 360, 20 A.L.R. 1159; Atlas Assur. Co. v. Hurst (C.C.A. 8), supra.

the inference of the sitting justice from proven facts is unreasonable, then his finding may be disregarded, and the appellate court determine the facts from the evidence before it, or may draw different conclusions from the facts found."

I believe sufficient has been said to show that the majority has acted on an unsound basis in its decision of the case.

The loss suffered was on two classes of merchandise: (1) That totally destroyed; (2) that which was damaged. To ascertain the amount of the goods totally destroyed, it is necessary to know the complete inventory immediately prior to the fire.

Appellant's merchandise was located in two different places. Part of it was kept at the factory, where the fire occurred, and the remainder was kept at the warehouse. Immediately after the fire the remaining merchandise at the factory was removed to the warehouse, and an inventory of the merchandise at the warehouse was taken by one Radford. Appellant employed Sugarman Bros. to handle the adjustment of the loss. This latter firm employed Hood & Strong, accountants, to make an examination, and to arrive at the value of the merchandise in the factory at the time of the fire.

Hood & Strong rendered their report to Sugarman Bros. on November 29, 1929, reporting the inventory at the factory to be $102,453.23. In making the report, the accountants used the figures disclosed in appellant's books. Briefly summarized, the amount of the inventory at the time of the fire was obtained as follows:

| | |
|---|---|
| Inventory—December 31, 1928, plus purchases and certain expenses............ | $1,448,860.23 |
| Deduct: Cost of sales January 1, 1929 to date of fire............................... | 1,282,734.23 |
| Apparent Inventory at time of fire....... | 166,126.00 |
| Less: Inventory at warehouse.......... | 63,672.77 |
| Balance—Inventory at factory........ | $ 102,453.23 |

In computing the cost of the sales, the accountants prepared a statement for the year 1928 showing the per cent. of gross profit of the total sales for that year. For the period from January 1, 1929, to the time of the fire the cost of the sales was computed by taking the amount of sales for that period and deducting therefrom gross profits, computed at the same per cent., for the period.

Radford was employed by appellees, and, as stated, made a physical count of the merchandise remaining after the fire. One of appellant's employees then priced the merchandise as if it had not been damaged. The total was then determined to be $86,807.98.

In the proofs of loss the amount of the Radford inventory, comprising the goods remaining after the fire, was deducted from the Hood & Strong report of the inventory comprising the value of the goods immediately prior to the fire, and the balance was $15,645.25 for goods "totally obliterated." The claim was made as follows:

| Items | Value | Loss |
|---|---|---|
| Merchandise totally destroyed.. | $ 15,645.25 | $15,645.25 |
| Merchandise remaining after fire | 86,807.98 | 53,580.67 |
| Damaged printing brands....... | 8,541.27 | 250.00 |
| Damaged stationery............. | 1,490.60 | 496.86 |
| Damaged sample bags.......... | 672.05 | 250.00 |
| Salvage expenses ............... | | 3,373.18 |
| Totals ....................... | $113,157.15 | $73,601.96 |

The trial court said that the report of the accountants, upon which the proofs of loss were based, was "based on data flagrantly insufficient," and that "Such values would be entirely theoretical, and would be based upon the assumption that profits for one year would be repeated the succeeding year." 58 F.(2d) 1003, 1009. The majority says regarding this report: "Manifestly an inventory built in this manner is very hypothetical and unreliable."

Neither appellees, the trial court, nor the majority has questioned the admissibility of the report because of the manner in which it was prepared. All seem to concede that it is relevant and competent, and that conclusion is supported by Liberty Tea Co. v. La Salle Fire Ins. Co., 206 Wis. 639, 238 N.W. 399, 402, where it was said: " * * * the weight to be given to it was for the jury to determine." The objection raised concerns the weight of the testimony, that is, that little or no weight should be given such a report.

It is obvious that practically no weight is given this evidence by either the majority or the trial court. The weight to be given it should depend on how accurate experience shows the method to be. Ronald's Accountant's Handbook by Paton (2d Ed.) a recognized authority in the accounting profession and which carries a list of distinguished accountants on its editorial and advisory committee, makes this comment regarding estimated inventories on the gross-profits basis (page 402): "The method is recommended by its simplicity and often gives quite satisfactory results, particularly in small stores where marking of goods is under personal supervision of proprietor. If merchandise passed into stock carries selling prices show-

ing an average mark-up, and if there are no extraordinary mark-downs or losses, the operations should show about an average margin, and inventories estimated in this manner will be substantially correct." In fact, a form of inventory taken on the gross-profits basis seems to be recognized by Treasury Regulations 94, Art. 22(c)-8, relating to income taxes. 1 Federal Register 1821.

I believe it to be apparent from the above that proper weight has not been given to this evidence. However, reliance need not be placed on the above authorities to show that such an inventory is substantially correct, for a second Hood & Strong report, next discussed, definitely proves it.

An audit was made by accountants Ernst & Ernst, as of May 31, 1929, at which time they certified to an inventory made by them. About a year after the fire, Hood & Strong used that inventory as a basis, added thereto the purchases from the time of the fire, and from the total thus reached deducted the "actual cost of the material sold plus direct labor applicable thereto from May 31, 1929, to October 19, 1929." From the figure remaining was deducted the inventory of merchandise in the warehouse, and the balance remaining was $132,947.44, which constituted the apparent inventory at the factory immediately prior to the fire.

The trial court found that included in the total of $132,947.44 were certain amounts included in the Ernst & Ernst inventory, which Hood & Strong also included subsequently, making duplications. The total of these items is $41,361.25, which, if deducted from the inventory value of $132,947.44, leaves a value of $91,596.19.

The first item of claimed duplication consists of 150 bales of burlap, said to be inventoried by Ernst & Ernst at $22,737.12, which arrived on the "Silver Elm" about the time the inventory was made. Concerning this item, appellant says in his reply brief, "We say frankly that there is a conflict of testimony on this item."

The second item claimed to be duplicated consisted of 50 bales of burlap which were delivered in April, 1929, to appellant and said to be inventoried by Ernst & Ernst at $7,725. The evidence as to whether or not the item was included by Ernst & Ernst is conflicting, there being positive testimony on both sides.

Another item of $300 was a credit memorandum issued by the seller of the 150 bales above mentioned. The price was $22,437.12 when reduced by the credit which was made after completion of the Ernst & Ernst inventory. Appellant admits that the Hood & Strong report, based on the Ernst & Ernst inventory, should be reduced by the amount of $300.

Appellees' claims that $9,199.13 should have been deducted from the Hood & Strong inventory because it was factory overhead, and that $1,400 should have been deducted because of a decreased unit value for finished bags, are unsound. There was evidence that Ernst & Ernst had included $9,199.13 for factory overhead in their inventory. At the time of taking this inventory, there was a large number of finished bags on hand. Ernst & Ernst computed the value of these bags by adding to the landed cost of the raw material, the amount mentioned comprising overhead expenses in converting the raw material into finished bags. Such procedure is correct [Treasury Regulations 94, Art. 22(c)-e(3), 1 Federal Register 1820], and I do not find that appellees' accountant questioned the propriety of such procedure.

When Hood & Strong made their inventory, they reported: "Using this [Ernst & Ernst inventory] as a basis, auditing the actual cost of the material sold plus direct labor applicable thereto from May 31, 1929 to October 19, 1929 (but without inclusion of factory overhead), we have developed the sum of $132,947.44 * * *"

Appellees' accountant construed the parenthetical statement, "but without inclusion of factory overhead," as meaning that in the figure reached by Hood & Strong ($132,947.44) there was not included any factory overhead; that actually, however, Ernst & Ernst had included $9,199.13 for factory overhead; and that in order to get an inventory "without inclusion of factory overhead," it would be necessary to deduct that amount included by Ernst & Ernst. In other words, the witness construed the statement "but without inclusion of factory overhead" as meaning that Hood & Strong did not include "factory overhead" in reaching their figure. This assumption is obviously incorrect. It is apparent from reading the statement made by Hood & Strong, that factory overhead was not included for the period from May 31, 1929, to October 19, 1929, only. The item of $9,199.13 was properly included by Ernst & Ernst in their inventory, and their

figure, therefore, was properly used by Hood & Strong. The trial court was plainly wrong in holding that this item should have been deducted.

The item of $1,400 mentioned in the preceding paragraph is likewise based on an assumption. Ernst & Ernst included finished bags in their inventory at a certain unit price. After the fire, an inventory at the warehouse included 68,000 bags at a lower unit price. By computing the value of the 68,000 bags at the lower unit price, it would indicate that there was $1,400 more merchandise at the factory. Appellees' accountant, however, assumed that the bags were manufactured in 1928, because of a pencil notation made on the inventory of the merchandise at the warehouse. As against this assumption, the evidence is too clear that the 68,000 bags were not manufactured in 1928 but in 1929. A journal entry on appellant's books, December 31, 1928, showed that there were no 1928 bags on hand at the time of the Ernst & Ernst inventory. This latter inventory itself shows no such bags. There was other evidence that the material, which was defective, was not received until 1929. The court was plainly wrong in holding that this item should have been deducted.

If it is conceded that the items of $22,737.12, $7,725 and $300 are deducted from the total arrived at by Hood & Strong, the balance would be $102,185.32. The report of the same accountants, computed in a different manner, upon which the proof of loss was based, gave the total as $102,453.23, showing the estimated inventory to be only $267.91 higher than the actual one.

It is difficult to see how stronger evidence of the correctness of the estimated inventory could be obtained. Such very strong and direct evidence must be considered with great care.

A former employee of appellant testified that he hauled nine truck loads of debris from the factory after the fire, which debris "was burned stuff of some kind, fabric, like burlap, and cotton, etc. * * *" A man in the scavenger business testified that he contracted to haul seven loads of debris from the factory after the fire, which included "burned cotton goods, and twine, and burlap, and glass", and on cross-examination testified:

"Q. Isn't it a fact that some of that you took away was sawdust? A. Sawdust, glass, cotton, burlap.

"Q. Wasn't some of it old burned lumber? A. Well, pieces of lumber, yes, we didn't get much lumber."

One of appellant's employees testified that the bulk of the loads hauled by the scavenger was sawdust and shavings.

Some of the appellees have computed that these loads contained 100 loads which if represented in the terms of bales, would have covered each of the four floors to a depth of 7½ feet, which would leave no space for machinery or the merchandise remaining after the fire. Other computations are made all of which are based on the erroneous assumption that the entire 16 loads was all burned merchandise. Such a claim, it is exists at all, exists only in the imagination of appellees. Appellant made no such claim, and the evidence bears out no such claim.

As against this strong proof, we must weigh evidence favorable to appellees. All of it is indirect or circumstantial except some documentary evidence.

Hood & Strong also made another report based on the Ernst & Ernst inventory, by using yardage and poundage units. The value thus shown was $106,643.29. Appellee's accountant testified that based on the two errors above mentioned there should be deducted $32,132.00, which would leave a balance of $74,511.29. In regard to this report, however, it was said: "This inventory is priced at actual cost of materials and does not include manufacturing costs of bags on hand, nor does it include miscellaneous merchandise on hand. All the elements entering into the computations of this inventory have been priced at actual cost." It is quite plain that this evidence does not weaken the direct evidence of appellant.

The other documentary evidence is shown in the trial court's opinion: "The books show a total value at both the factory and plaintiff's warehouse of $153,056.36. Deducting from this the values at the warehouse established by count immediately after the fire we find that the books show a value at the factory of $89,383. Strikingly similar is the value shown by the perpetual inventory or summary of stock sheets kept by Taylor, plaintiff's accountant. * * * A summary was made of it by * * * an accountant * * * and it is from his work-sheet that we know the total of $88,272.55, only $111 less than the book values. * * * Further there is a journal entry showing products on hand on the date of

the fire made after the fire which varies from the perpetual inventory by only $14.00 * * *."

There was testimony that the perpetual inventory was incomplete, and always showed less merchandise than was actually on hand. Similar evidence was introduced regarding the book inventories. Appellant's book inventories for a prior year varied greatly from the actual count. In Accountant's Handbook, supra, 401, it is said: "Experience shows that the results of the complete periodic inventory seldom check exactly with the balances as shown by the book inventories, assuming such are maintained * * *." In the light of the foregoing, it must be said that the perpetual and book inventories have little, if any, weight.

The circumstantial evidence is meager. Part of it was that burlap is difficult to burn. The evidence was, however, that it does burn "readily if it is exposed close enough to living fire."

Then there was other evidence that the fire was extinguished on the fourth floor "in not more than thirty minutes" and the fires on the other floors were extinguished in five to fifteen minutes; the slight damage to the building; the testimony of the fire chiefs "that the fire in the stock was not extensive and that probably none was obliterated by the fire"; and the following, shown by the trial court's opinion: " * * * It took longest to overhaul the stock (overhauling means opening up stock in which there is fire and wetting it thoroughly to prevent reignition) on the mezzanine floor where the fire was smudgy, yet that was completed in forty-five minutes. At the end of twenty minutes all but four of the companies were sent away. The water tower never went into action. A significant comparison was made with two other recent fires in bag factories. One took eighteen hours to overhaul and the other took eleven hours to overhaul." This evidence, however, must be considered with the knowledge that fire seems to have a habit of doing strange and unusual things.

The foregoing evidence came from the testimony of witnesses O'Neill, Mahoney, and Kelly, more particularly described by the majority. Witness O'Neill testified that "there were embers of some sort, but you could not tell whether it was burlap that had been burned up"; that he "would not say that there was no merchandise that was reduced to ashes." A written report of the fire was made shortly afterward. In it was stated that seven low-pressure streams were used for three hours. Two years after the report was made, O'Neill flatly said that the report was wrong. The report also showed that 139 men were on duty at the fire and that seven high-pressure streams were used for 34 minutes. Finally, O'Neill testified: "That quality of ash produced by burnt burlap and cotton would be of such a character that water would readily wash it away."

Witness Mahoney testified: "When I said that I had it under control in about twenty to thirty minutes I mean by that, the progress of the fire completely stopped, not spreading any more, it was confined, and the blaze that was going through the roof was knocked."

Witness Sullivan was employed by an organization which "is composed of all insurance companies in San Francisco." He denied making any statement to a reporter for a newspaper on the day following the fire, estimating the loss to be between $50,000 and $65,000, yet the reporter testified positively that Sullivan made the statement to him at the reporter's request. As between the disinterested reporter, and the "interested" Sullivan, certainly some doubt is thrown on Sullivan's evidence.

There was also evidence that less than 1 per cent. of the bags in process were destroyed, but most of the stock was not "bags in process."

In addition to this evidence, we must consider the effect of the trial court's decision. If it made serious mistakes the presumption of correctness disappears. Several serious mistakes have been pointed out. The trial court said that "the suspicious circumstances surrounding the fire may be considered in connection with the defense of fraud and false swearing as to values where the estimate of value in the claim of loss is grossly excessive." 58 F.(2d) 1003, 1006. Dictum in Orenstein v. Star Insurance Company (C.C.A.4) 10 F.(2d) 754, 757, sustains the statement. That dictum is incorrect. There is no sound reason for saying that the fact that one person set a fire to another person's store, is evidence of fraud and false swearing to the values of the store's contents by the latter person. The trial court also said that the amount of goods claimed in the proof of loss would tax the building beyond capacity. The evidence does not sustain the statement, and at least one of the appellees admits it. In view of

these serious errors the presumption of correctness has disappeared.

Weighing the evidence, the strong direct evidence is not overcome by the weakened circumstantial evidence. I believe we should accept the inventory value in the second Hood & Strong report of $102,185.32 plus a small amount of factory overhead applicable to the finished bags, for the period from May 31, 1929, to October 19, 1929.

The value of the goods totally obliterated would, therefore, be the difference between the value of the merchandise remaining after the fire (without deduction for damage), and the total inventory mentioned. The best record of the value of the merchandise remaining after the fire, is contained in the Radford inventory.

The goods remaining after the fire, shown on the Radford inventory, were shown in the proofs of loss to correspond with the Radford inventory. The trial court said that "the fraudulent padding commenced with the pricing and grading of this inventory," and points out that because of mistakes in grading the merchandise, the value of the inventory was excessive by $6,000. The trial court also said that "there was a deliberate deception as to price." The amounts found by the trial court do not bear out the statements. It finds a total inventory of $88,000, and the value of the goods totally destroyed to be $2,000 so that according to its findings the value of the goods remaining was $86,000. As shown by the inventory the value was $86,807.98. In the court's computation of the goods totally destroyed it used the amount of the Radford inventory without reduction. If, as the opinion states, the Radford value was excessive, the "out of sight" loss would exceed the amount stated by the court. The Radford inventory should be substantially correct.

After receipt of the proofs of loss, all appellees but the Western Company and the National Liberty Company, through their adjusters by letter admitted values and losses as follows:

| Items | Value | Loss |
| --- | --- | --- |
| Merchandise totally destroyed... | Nil | Nil |
| Merchandise remaining after fire | $80,000.00 | $20,000.00 |
| Damaged printing brands........ | 8,541.27 | 50.00 |
| Damaged stationery ............. | 1,490.60 | 300.00 |
| Damaged sample bags............ | 672.05 | 10.00 |
| Salvage expenses ................ | | 2,373.18 |
| Totals ........................ | $90,703.92 | $22,733.18 |

From these two tables it can be seen that the value of the merchandise remaining after the fire was $33,227.31 according to the proofs of loss, and $60,000 according to the admissions of certain appellees. The merchandise remaining after the fire was subsequently sold, the recovery being as shown by the following testimony of appellant: " * * * The net recovery was approximately $34,000—a little less. After we had paid the expenses it was $33,263.87. Then after deducting expenses which we had already paid out in salvaging this merchandise and taking care of it and reconditioning it, there was a net recovery of $26,437.32."

The Western Company admitted through their adjuster, by letter, that the value of the stock at the time of the fire was approximately $90,000.00. The National Liberty Company replied that it had "ascertained and determined that at the time of the fire * * * you did not have on hand property of the value of $100,000.00 * * *."

With respect to the merchandise remaining after the fire, appellant claimed in his proofs of loss that it was all damaged. His adjuster estimated the damage to goods valued at $792.10 at 33½ per cent.; goods valued at $51,724.18 at 50 per cent.; goods valued at $10,767.49 at 75 per cent.; goods valued at $18,213.29 at 80 per cent.; goods valued at $4,966.42 at 90 per cent.; goods valued at $344.60 at 100 per cent. These estimates were incorporated in the proofs of loss which were executed by appellant. Appellant. introduced evidence to corroborate these figures, in addition to the amount received upon sale of the salvaged goods.

On behalf of appellees, evidence was introduced minimizing the damage. Such evidence tended to show that a part of the remaining merchandise was entirely unharmed. There was testimony that firemen covered a part of it with tarpaulins to keep it from getting wet. At auction the merchandise brought a net recovery of approximately $25,000, but there was evidence that prices had declined 15 per cent. at the time of the sale.

The trial court did not find the amount of damage to the goods remaining after the fire.

To summarize, I believe that the trial court and the majority have considered the case under an erroneous premise. I think the decree should be reversed with the following directions: (1) Determine the value of the goods remaining after the fire and the amount of damage thereto; (2) determine

the amount of factory overhead mentioned to be added to the inventory figure of $102,-185.32; (3) deduct from the sum thus arrived at, the value found for the goods remaining after the fire, which will result in the amount of goods totally obliterated; (4) add to the amount thus obtained the amount of damage to the goods remaining, the sum of which will be the total loss; (5) apportion the liability among appellees as prayed for in the bill.